UNITED STATES of America,
Plaintiff–Appellee,

v.

Fernando GARCIA, Defendant–Appellant.

No. 94–2476.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1994.

Decided Jan. 17, 1995.

CUDAHY, Circuit Judge.

Defendant Fernando Garcia appeals from his conviction for conspiracy to distribute and possess with intent to distribute multiple-ounce quantities of heroin and multiple-kilogram quantities of cocaine, in violation of 21 U.S.C. § 846. Garcia contends that the government failed to prove beyond a reasonable doubt that he participated either in aiding and abetting or in a conspiracy; in fact, he was no more than a sometime-observer who slept through—or was otherwise absent from—most of the conspiracy's meetings.

## BACKGROUND

In Fall 1993, Garcia and Jose Varela (a paid informant for the DEA) were both incarcerated in a halfway house. Varela testified that the two men spoke daily about setting up future cocaine and heroin deals. Garcia was released first, and left Varela instructions on how to contact him. When Varela was released, he contacted Garcia and they discussed setting up a drug deal. Garcia agreed to seek out a buyer, and told Varela: "I'm going to take you and introduce you to a friend of mine. . . . This is the main man. . . . He's real good." Garcia and Varela drove to the home of Loreto Sianez, where Garcia introduced Varela, saying, "Look, this is a friend of mine that I had told you about and he's the guy that buys a lot of drugs and pays for them right away." Sianez showed the other two men several firearms, some cocaine, and stated he could obtain heroin for Varela to buy. Tr. 87. Garcia occasionally fell asleep during the conversation.

In subsequent contacts during November and early December, many telephone conversations between Garcia and Varela were recorded. Garcia initiated some by telephoning or beeping Varela; Varela initiated some; and undercover agent Alfredo Ibanez initiated other contacts. Garcia attended some—but not all—of the meetings between Varela, Sianez, and Ibanez. During some conversations, Garcia boasted about previous drug deals, and said that if things did not work out with Sianez, Garcia had another source selling 50 ounces of heroin.

Finally, a tentative deal was set up between Sianez and Varela. After Varela

Robert W. Kent, Jr., Asst. U.S. Atty. (argued), Criminal Div., Barry Rand Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Paul A. Wagner, Chicago, IL (argued), for defendant-appellant.

Before CUDAHY, FLAUM, and EASTERBROOK, Circuit Judges.

picked up the sample of heroin from Sianez, Garcia beeped him and asked about the quality of the sample. Garcia agreed to contact his other heroin source in order to accommodate another buyer Varela knew. Garcia subsequently beeped Varela and complained that he hoped the Sianez deal would go through so there would be some money for him. Several days later, Garcia called Varela and instructed him where to meet Sianez. A few days later, Garcia telephoned Varela and said he wanted to meet with him; later he left a message instructing Varela on where they would meet.

In a subsequent conversation between Sianez and Varela, they discussed Garcia's urging them to consummate the deal, and they agreed that if a deal occurred they would let Garcia know and agreed "there's enough for everyone." They also agreed that Garcia should be present during the transaction. Garcia continued to telephone Varela from time to time, checking on the progress of the deal between Varela and Sianez. Garcia made statements such as: he wanted to "work" with Varela "the way that we had agreed," and "All right, then. That's what I want. Work just the way you had told me."

On December 6, Varela bought five kilograms of cocaine from Sianez. He and Agent Ibanez picked up 5003 grams of 91% pure cocaine from Sianez's home. Sianez was then arrested. The next day, Garcia telephoned Varela, and the day after that, they met. Varela explained that his "brother-in-law," Ibanez, had gone back to pay Sianez and discovered police at his house. Garcia agreed to take the money—over $100,000—to Sianez's wife. Varela offered to pay Garcia $500 per kilogram, and Garcia agreed. Garcia was then arrested.

## DISCUSSION

### I. Conspiracy

Garcia bears a heavy burden in attempting to overturn his conviction on the basis of insufficient evidence. In reviewing the evidence, we must draw all reasonable inferences in the government's favor, and we will reverse only if no rational jury could have found Garcia guilty beyond a reasonable doubt. *United States v. Hubbard*, 22 F.3d 1410, 1415 (7th Cir.1994), *cert. denied*, —

U.S. ——, 115 S.Ct. 762, 130 L.Ed.2d 660 (1995). We will not reweigh the evidence or reevaluate the credibility of witnesses. *Id.*

In order to prove participation in a drug conspiracy, the government must establish that a conspiracy existed and that defendant knowingly and intentionally joined in its criminal purpose and agreed with others to commit a crime. *United States v. Cabello*, 16 F.3d 179 (7th Cir.1994); *United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir.) (en banc), *cert. denied*, — U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). The government need not prove that defendant performed an overt act in furtherance of the conspiracy. *United States v. Shabani*, — U.S. ——, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994); *United States v. Sassi*, 966 F.2d 283, 285 (7th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992).

The government's evidence established that a conspiracy existed and that Garcia knowingly and intentionally participated in its goal of drug distribution. Throughout the weeks of negotiation, Garcia acted as a middleman or broker. *See Lechuga*, 994 F.2d at 350–51 (defendant who agrees with a drug source to broker a drug transaction between the source and a buyer is guilty of conspiring to engage in narcotics trafficking); *United States v. Badger*, 983 F.2d 1443, 1449–50 (7th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993) (same); *United States v. Manzella*, 791 F.2d 1263, 1265–66 (7th Cir.1986) (same).

Garcia introduced Varela to Sianez solely for the purpose of facilitating a drug deal between them. There were numerous contacts that Garcia initiated. He worked hard to move the deal along. He also volunteered for various chores, including delivering the $100,000 to Sianez's wife. *See United States v. Cea*, 914 F.2d 881, 887 (7th Cir.1990) (defendant was more than a go-between with no authority; he "worked diligently in trying to set up the transaction from which he expected to profit"); *United States v. Levy*, 865 F.2d 551, 556–57 (3d Cir.1989) (en banc) (holding that defendant was co-conspirator where he acted as broker, notwithstanding

his trouble consummating the deal between buyer and seller).

Garcia points out that sometimes he was not even present when Varela and Sianez met. Also, Sianez began calling Varela directly. In recorded conversations during these meetings, it was Varela who would raise Garcia's name. The language in *United States v. Manzella* is relevant here:

> Manzella's role as broker probably was essential and certainly was helpful to the consummation of the transaction. He was as much a part of the conspiracy as a real estate broker is a part of the deal to sell a house. It makes no difference that Manzella was not present at the sale; he had played a significant role, through his negotiations with Apuzzo, in bringing about Weiss's sale to Lopez. *Manzella*, 791 F.2d at 1265–66.

Garcia's presence at each meeting, during each conversation, throughout the many weeks of negotiation, was not necessary in order to find him guilty of conspiracy. *See United States v. James*, 40 F.3d 850, 860 (7th Cir.1994) (evidence of defendant's physical presence during the duration of the conspiracy is not necessary), *cert. denied*, —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995); *United States v. Marshall*, 985 F.2d 901, 905 (7th Cir.) (same), *cert. denied*, —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

Garcia points to Varela's testimony that during one drug-related conversation between himself and Sianez, Garcia dozed off several times. During other conversations, Garcia was merely listening to Varela and Sianez discuss drug deals. That credibility determination was made by the jury, and we see nothing in the record that mandates our finding that the testimony is incredible as a matter of law, i.e., unbelievable on its face. *See United States v. Wallace*, 32 F.3d 1171 (7th Cir.1994). Moreover, a "conspirator need not know all of the ... details of a conspiracy to be held responsible as a co-conspirator." *United States v. Missick*, 875 F.2d 1294, 1297 (7th Cir.1989).

Garcia, however, argues that there is no evidence of an agreement between Varela and Garcia to introduce Varela to potential narcotics purchasers, except for Varela's testimony. That is sufficient. Moreover, the broker's fee and the numerous conversations recorded by the government corroborate Varela's testimony. Garcia insists that the fact that he was paid a broker's fee of $500 for each kilogram was a surprise to Garcia. He certainly did not expect it, and when the money was offered, he was just "winging it." At that point Garcia was nothing more than an "opportunist, the observer of the dealings between Varela and Sianez who sees in the breakdown of those dealings the opportunity to make some money." *Id.* Similarly, Garcia maintains that he never asked for the money; rather, Varela offered it to him. The conversation was recorded:

> VARELA: The 500. I'm going to give you 500 per kilo. What do you think? Do you agree?
>
> GARCIA: That's fine. There's no problem. There's no problem with me.

Garcia would not have performed the introductions, diligently urged the deal along, persistently checked on the progress of the meetings and quality of samples, attended meetings and made numerous telephone calls, if he expected nothing more than a "thank you" from Varela and Sianez.

## II. Aiding and Abetting

Garcia also argues that the evidence was insufficient to find him guilty of aiding and abetting. Counts Two through Five charged Garcia with the actual deliveries of narcotics (both the cocaine and heroin samples, and the final 5003 grams of cocaine). Garcia relies on the same arguments that we have noted. "If the evidence is insufficient to uphold a guilty beyond a reasonable doubt conviction on the conspiracy count, the evidence is likewise insufficient as to the other counts." The crime of aiding and abetting requires *knowledge* of the illegal activity that is being aided and abetted, a *desire* to help the activity succeed and some *act* of helping. *United States v. Valencia*, 907 F.2d 671, 677 (7th Cir.1990). The government met this burden with the same evidence used to support the conspiracy conviction. *See United States v. Osmani*, 20 F.3d 266, 268 (7th Cir.1994) (aiding and abetting). In addition, the jury could have found Garcia

guilty under *Pinkerton v. United States*, 328 U.S. 640, 648, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) (co-conspirators guilty of any offense committed by another co-conspirator in furtherance of, or as a natural consequence of, the conspiracy).

## CONCLUSION

The judgment of the district court is AFFIRMED.