UNITED STATES of America, Plaintiff–Appellee,

v.

George H. RUTH, Defendant–Appellant.

No. 95–1311.

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1995.

Decided Sept. 6, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 20, 1995.

---

Victoria Ursulskis, Sharon Jackson (argued), Office of the United States Attorney, Indianapolis, IN, for plaintiff-appellee.

William H. Dazey, Jr. (argued), Qualkinbush & Dazey, Indianapolis, IN, for defendant-appellant.

Before CUMMINGS, CUDAHY and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

George Ruth appeals various aspects of his conviction for possession of phenylacetic acid

with intent to manufacture methamphetamine. The district court upheld the conviction against his challenges of double jeopardy, insufficient evidence, invalid search warrants and violations of the Speedy Trial Act. Ruth now appeals these decisions, as well as the district court's applications of the Sentencing Guidelines. We affirm on all claims.

## I. FACTS

George Ruth was arrested on March 17, 1994 and charged with possession of phenylacetic acid with intent to manufacture methamphetamine in violation of 21 U.S.C. § 841(d)(1). This arrest was the culmination of an ongoing investigation by the Drug Enforcement Agency (DEA) into Ruth's attempts to purchase phenylacetic acid (PAA).

In October of 1993, Mays Chemical in Indianapolis, Indiana was contacted by a representative of "Countryside Fragrances" concerning the purchase of PAA. This person told a Mays representative that Countryside Fragrances was a car fragrance business, and that Mays' contact person at Countryside would be George Ruth. Because Countryside had never been a customer of Mays', company policy required a credit check to be made and certain forms to be signed for the purchase of "precursor" chemicals (chemicals that can be used for manufacturing narcotics) like PAA. Mays discovered that Countryside could not be verified as an actual business and attempted to recontact Countryside by telephone. However, the telephone was answered simply "hello" and the contact person, George Ruth, was reported to be in the garage. Finding this situation suspicious, Mays informed Countryside that Mays was unable to obtain PAA to fill Countryside's order.

A few months later, in February of 1994, a "Lenzille Byrd" (Byrd) applied for and received a private mailbox at Post Office Express on behalf of Countryside Fragrance. Three days later, someone identifying himself as Lenzille Byrd and purportedly acting on behalf of Countryside Fragrances, called Aldrich, a chemical company in Milwaukee, Wisconsin, to place an order for 110 pounds (50 kilograms) of PAA. Aldrich also did a background check on Countryside and found that no such business existed. Well aware that the largest orders for PAA in Aldrich's fragrance division are usually no more than 25 kilograms, not the 50 kilograms that Countryside had ordered, Aldrich found the situation suspicious and contacted the DEA.

In cooperation with the DEA, Aldrich arranged with Countryside to send the PAA in installments, with the first portion being ten pounds broken down into an eight pound and a two pound shipment. Aldrich then sent the first installment of the Countryside order to the DEA, which examined it to ensure that it was actually PAA, and then sent it on to the Post Office Express mailbox given by Byrd. A man (later identified as Ruth) arrived to pick up the package, informing the counterperson (a DEA agent posing as an employee) that he was picking up the package for Byrd, but that he was not Byrd, he was "George" (Ruth's first name). The DEA followed Ruth/Byrd as he left with the package, but evasive tactics by Ruth caused the surveillance to be suspended.

The DEA then sought and received a search warrant for a blue garage at 2003 Lafayette Road, Indianapolis, Indiana. The garage had been rented to Ruth, and Ruth had arranged for electrical service to start at the garage on the day the PAA was delivered. The search of the garage revealed extensive evidence of a clandestine laboratory for making methamphetamine, and that the creation of a batch of methamphetamine had just been completed. A truck owned by Ruth was also on the premises and it too contained evidence of a drug "cook."

Following the search, a DEA agent arrested Ruth. Ruth had on his person at the time a driver's license and personal checks, both in the name of Lenzille Byrd. The photo on the license, however, was Ruth's face. At the time of his arrest, the government also seized $7,552 from Ruth pursuant to 21 U.S.C. § 881(a)(6) (1981 & Supp.1993). This seizure and subsequent forfeiture is discussed in greater detail below.

The jury found Ruth guilty on the single count of the indictment, possession of phenylacetic acid with intent to manufacture methamphetamine in violation of 21 U.S.C.

§ 841(d)(1). He was sentenced to 120 months imprisonment and supervised release for 3 years, and a fine of $15,000 was imposed. Ruth now appeals his conviction on the grounds of double jeopardy, failure to suppress evidence, violation of the Speedy Trial Act and insufficient evidence. He also contends that the district court misapplied the Sentencing Guidelines in determining his sentence.

## II. DISCUSSION

### A. Double Jeopardy

■ Ruth first argues that his conviction is barred by the Double Jeopardy Clause. The Double Jeopardy Clause of the Fifth Amendment provides "no person shall ... be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const. Amend. V. Ruth claims that his prosecution violates this principle on the grounds that the forfeiture of his $7,552 constitutes a former jeopardy, making a criminal conviction for the same crime a second, barred, punishment. He contends that recent decisions by the Supreme Court, finding that civil penalties can constitute "punishment" for the purposes of double jeopardy, establish that a civil forfeiture such as the one to which he was subjected is also "punishment" for double jeopardy purposes. *See Montana Department of Revenue v. Kurth Ranch,* —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993).

This same argument was recently addressed in this circuit in *United States v. Torres,* 28 F.3d 1463 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 669, 130 L.Ed.2d 603 (1994). There we recognized, as the Supreme Court has, that "forfeiture and civil fines can be penalties for a crime," (citing *Austin,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 and *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989)), and that "a financial exaction can count as a separate jeopardy" (citing *Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 and *Kurth Ranch,* —— U.S.

—— , 114 S.Ct. 1937, 128 L.Ed.2d 767). In *Torres,* as here, the defendant asked us to "put these opinions together and hold that the forfeiture ... is a former jeopardy barring the sentence of imprisonment." *Torres,* 28 F.3d at 1464.

In *Torres,* however, this court ultimately concluded that the defendant had not been subjected to double jeopardy because he had not contested his forfeiture. The failure to contest the forfeiture, we determined, meant that the defendant was not a party to the forfeiture and thus had not been subjected to a "former jeopardy." *Id.; see also United States v. Penny,* 60 F.3d 1257, 1262 (7th Cir.1995) (agreeing with *Torres* "that an individual could not be placed in former jeopardy if ... he did not make a claim to ownership of the assets"). However, Ruth argues that his case is different from *Torres* in that he demonstrated at least an attempt to contest the forfeiture, thereby making him, he claims, a party to the forfeiture and a legitimate claimant for dismissal of his prosecution under the Double Jeopardy Clause.

The seizure of Ruth's property was, we must concede, a rather inadequately handled matter. When Ruth was arrested, the government seized $7,552 from him pursuant to 21 U.S.C. § 881(a)(6) (1981 & Supp.1993). On May 2, 1994, the DEA sent Ruth notice that his property had been seized and was subject to forfeiture. Ruth received this notice on May 9th, and had until May 31st to respond and contest the forfeiture.[1]

■ Ruth asserts that he mailed a letter on May 24th asking for an extension of time in which to contest the forfeiture or "request remission or mitigation of the forfeiture," and has provided us with a copy of that letter. Appellant's App. 34–35. The DEA, though, asserts that it has no record of receiving this letter from Ruth. Nevertheless, the DEA sent a letter to Ruth on June 16th which indicated that it had in fact received something from him. Appellant's App. 32–33. This letter advised Ruth that his "claim for the property" had been received, but was being returned because it was submitted after the last date to file. It also notified Ruth

---

1. The time limit for contesting a forfeiture is 20 days after the date of first publication of the notice. *See* 19 U.S.C. § 1607–1609 and 21 C.F.R. § 1316.75–77.

that "proceedings have been taken to administratively forfeit and dispose of this property." Further, the letter stated that

> [a]lthough you did not file a Petition for Remission and/or Mitigation, along with your claim, . . . we will allow you 20 days, from receipt of this letter, to file a petition for an administrative ruling by [the DEA] before the property is disposed of according to law. *Id.*[2]

This letter was correctly addressed to Ruth and properly indicated May 31st as the last date to file a claim. However, the case number for the forfeiture was incorrect by one number, and as a result the rest of the information in the header box of the letter referenced the wrong seizure. *See* Appellant's App. 32. On June 17th, the day after this letter to Ruth was mailed, the DEA declared the property forfeited.

The district court concluded that this confusing letter from the DEA was a notice that the DEA was denying Ruth's request for extension of time because the request was received after the deadline. As the district court explained,

> Although the Government's denial of Mr. Ruth's tardy request for an extension of time was sent out under the wrong seizure number, it is clear that the document was intended for Mr. Ruth. His correct address is on the document as is the correct date that was the last date to file a claim. . . .
>
> Mem.Op. at 3, n. 4.

■ The district court concluded that Ruth's letter arrived, but that it arrived after the May 31st deadline—too late to make him a party to this forfeiture. We owe deference to the factual determinations of the district court, and, without evidence that these determinations were somehow obviously incorrect, we will not overturn the district court's factual finding. *See, e.g., United States v. Taylor,* 487 U.S. 326, 337, 108 S.Ct. 2413, 2419–20, 101 L.Ed.2d 297 (1988). "You can't have

double jeopardy without a former jeopardy," *Torres,* 28 F.3d at 1465, and "[a]s a nonparty, [Ruth] was not at risk in the forfeiture proceeding." *Torres,* 28 F.3d at 1465. Although in reality Ruth may have suffered two harms—the loss of his property in the forfeiture and the separate threat of loss of liberty from the criminal case—he cannot have been subjected to *double* jeopardy because he was only a party in a *single* case (the criminal case). This determination is dispositive, and we therefore need not investigate the more troubling issue of whether this civil forfeiture, had Ruth been a party, would implicate double jeopardy concerns. Ruth's failure to become a party to this forfeiture bars him, under *Torres,* from prevailing on a double jeopardy claim.

### B. Suppression of Evidence

■ Ruth next contends that the search of the blue garage was not supported by a valid search warrant. In order to contest the search, however, Ruth must establish that he had a reasonable expectation of privacy in the blue garage. *United States v. Myers,* 46 F.3d 668, 669 (7th Cir.1995) ("[a] search within the meaning of the Fourth Amendment occurs only when a reasonable expectation of privacy is infringed"); *United States v. Duprey,* 895 F.2d 303, 309 (7th Cir.1989) ("[a] defendant objecting to the search of a particular area bears the burden of proving a legitimate expectation of privacy in the area searched"), *cert. denied,* 495 U.S. 906, 110 S.Ct. 1927, 109 L.Ed.2d 291 (1990).

■ A reasonable expectation of privacy exists when "(1) the complainant exhibits an actual (subjective) expectation of privacy and, (2) the expectation is one that society is prepared to recognize as 'reasonable'." *Myers,* 46 F.3d at 669. However, Ruth has repeatedly declined the opportunity to submit an affidavit or testify regarding his privacy interest. Instead, Ruth attempts to uphold his burden simply by relying on the

---

**2.** In other words, Ruth was given an additional 20 days to file a Petition for Remission and Mitigation. Such a petition does not serve to contest the forfeiture, but rather is a request for an executive pardon of the property based on the petitioner's innocence or, for a wrongdoer, on a

plea for leniency. 19 U.S.C. § 1618. (For an in-depth discussion of petitions for mitigation, *see* Asset Forfeiture Office, U.S. Dep't of Justice, *Asset Forfeiture Manual: Law and Practice* 1:3–8 (1993)).

facts cited in the Federal Affidavit for a search warrant and in testimony by DEA Agent Gaertner at one of the hearings on the motion to suppress.[3] Yet it is Ruth, not the government, who bears the burden of establishing a privacy interest, and we agree with the district court that "without an affidavit or testimony from the defendant it is almost impossible to find a privacy interest because this interest depends, in part, on the defendant's subjective intent and his actions that manifest that intent." Mem.Op. at 4.

The district court also concluded that even if Ruth were allowed to rely on the evidence submitted by the government, it was insufficient to establish Ruth's reasonable expectation of privacy in the garage. Mem.Op. at 11. Ruth admits that the government evidence on which he wished to rely established only that Ruth leased the garage, that he was seen on the premises and that the remnants of the PAA delivered to Ruth were found at the garage. Appellant's Br. at 36. As the district court recognized, there was also evidence that at least one other person had a key to the garage. Mem.Op. at 12. Further, the government's evidence at that time did not establish that Ruth had made any kind of concerted effort to keep people out, and did not establish whether a business existed in the garage, or whether Ruth had taken any other actions that demonstrated even a subjective expectation of privacy. *Id.* Without testimony from Ruth, the district court concluded, there simply was not enough evidence of a reasonable expectation of privacy on Ruth's part for Ruth to contest the search.

This conclusion does not leave us with "the definite and firm conviction that a mistake has been committed." *United States v. McAllister,* 18 F.3d 1412, 1416 (7th Cir.1994). We understand that Ruth did not want to present evidence of his control over the garage, as that evidence would be used against him at trial to prove his involvement in the illegal activities that occurred there. However, Ruth cannot simply rely on the government to establish his privacy interest, and even if he could, the government evidence is not sufficient to do so. We will therefore uphold the decision of the district court.

## C. Speedy Trial

Third, Ruth claims that more than 70 days passed between his indictment and trial in violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* Yet all calendar days that elapse between indictment and trial do not necessarily go toward the 70 days allotted by the Speedy Trial Act (the Act)—many periods of delay may be excluded from the computation period. The district court here concluded that every day since May 4, 1994, was excluded from computation. Since Ruth was indicted on April 19, 1994, the district court ruled that the Act had not been violated. Mem.Op. at 11–12. We review these conclusions with great deference; "[a]bsent legal error, exclusions of time cannot be reversed except when there is an abuse of discretion by the court and a showing of actual prejudice." *United States v. Marin,* 7 F.3d 679, 683 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994).

---

**3.** Ruth now claims that he should have been given a hearing to establish his privacy interest in the blue garage. However, Ruth's attorney, Mr. Dazey, specifically informed the district court that he wished to rely on the Affidavit and Agent Gaertner's prior testimony, and that he only wanted a hearing to "prove" the testimony already in the record. In fact, the district court questioned Dazey specifically on this issue in the following colloquy:

The Court: When you say you would offer to prove, I'm inferring from that you would prove by calling Agent Gaertner to the stand and have him repeat what testimony is listed ... and the assertion[s] ... of his probable cause affidavit ...?

Mr. Dazey: Yes.
The Court: Is that what you are saying you would do?
Mr. Dazey: Yes.
The Court: And is that it?
Mr. Dazey: I believe so, your Honor, yes.
R.O.A., Tr. 10:6–7.
The district court then accepted all the evidence already in the record, without requiring Mr. Dazey to re-establish it by requestioning Agent Gaertner. Thus, Ruth was not denied any hearing that he had requested, and was not only permitted, but in fact encouraged, to submit all the evidence that he wished of his privacy interest in the blue garage.

■ Ruth specifically contests two periods of delay. He first argues that the one month lapse between the time he filed a notice of *pro se* appearance (August 8, 1994) and the district court's official recognition of his self-representation (September 6, 1994) should not be charged to him under the Act. In response to this claim, the district court provided a detailed explanation of its actions during this period. Mem.Op. at 14–15.

On August 4, 1994, Ruth filed a number of motions *pro se*. The district court dismissed these motions because Ruth was at the time represented by counsel. At the same time, Ruth's counsel moved to withdraw. The court granted the withdrawal and appointed successor counsel, but Ruth continued to file numerous motions *pro se*. On August 22, 1994, the successor counsel reported to the court that the defendant wished to represent himself. On September 6, 1994, the district court held a hearing on Ruth's request to represent himself. Concluding that Ruth was competent to represent himself, the court then recognized his *pro se* motions.

Under the Act, "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excluded from the computation of the 70 days. 18 U.S.C. § 3161(h)(1)(F). Given the circumstances, including Ruth's voluminous filings of pretrial motions and the speed with which the district court moved in the face of so many motions, we find that the district court promptly disposed of this matter and did not abuse its discretion in excluding the delay from the computation of allotted time under the Act.

■ Ruth also claims that the two continuances granted to the government because of Ruth's refusal to provide handwriting exemplars should not be excluded from the allotted 70 days. The continuances were granted because Ruth twice failed to provide the handwriting exemplars requested by the government and ordered by the court. Ruth's first refusal to comply with the court's order was ostensibly because of his diabetes; the second he claims to have been on the advice of his lawyer. However, the district court found these to be justifications offered after the fact to excuse what was in reality a simple refusal to cooperate with a court order. In fact, Judge McKinney held Ruth in contempt for his ongoing obstruction of the collection of handwriting exemplars. R.O.A., Tr. 2:73. Yet Ruth argues that because the government eventually found another way to prove its case and did not try a third time to take the handwriting exemplars, they were never needed in the first place. Such a claim cannot render the continuances invalid.

As Ruth admits, a continuance granted by a judge "on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial" is excluded from the computation of the allotted 70 days. 18 U.S.C. § 3161(h)(8)(A). Here, the fact that the government eventually managed to find a way around the lack of handwriting exemplars certainly does not prove that the stated need for the exemplars was pretext. Further, even if the government's failure to attempt a third time to collect the handwriting exemplars throws doubt on its motives, evidence to that effect was not available to the district court at the time it granted the continuances. Thus there is no evidence that the district court abused its discretion when it granted the continuances requested by the government.

## D. Sufficiency of the Evidence

■ Ruth next argues that there was insufficient evidence to establish that the substance he possessed was actually phenylacetic acid and that he had the specific intent to manufacture methamphetamine. In deciding this issue, we must determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rosalez–Cortez*, 19 F.3d 1210, 1215 (7th Cir.1994) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). "We may overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.*

■ Ruth admits that a substance clearly labeled phenylacetic acid was shipped from Aldrich (a legitimate chemical supplier) to the DEA offices in Indianapolis, that the substance gave off the peculiar odor associated with phenylacetic acid even when inside a plastic bag, that he possessed this substance and that a similar or identical plastic bag was later found on property leased by Ruth. The government also established at trial that the DEA agent had opened the package from Aldrich and smelled the unique smell of PAA before he sent it on to be picked up by Ruth. This evidence, especially when viewed in the light most favorable to the government, is enough for a rational trier of fact to find that the substance Ruth possessed was phenylacetic acid.

■ Ruth also argues that there was insufficient evidence that he possessed PAA with the intent to manufacture methamphetamine. Specifically, he claims that, while there was evidence to support a finding that Ruth possessed the substance with knowledge that other persons intended to manufacture controlled substances with it, there is no evidence that Ruth himself ever had that intention. However, the government presented evidence that Ruth himself arranged for the purchase of the PAA, going so far as to create a false persona and false business in order to arrange the purchase, that Ruth told employees to stay away from the garage on the weekend that methamphetamine was made in the laboratory, that Ruth himself picked up the delivery of PAA and drove evasively to escape surveillance, that Ruth was the renter of the garage where the methamphetamine was made and that Ruth was the one who arranged for the start of electric service to the garage at the same time that the PAA arrived. Again, this evidence, when viewed in the light most favorable to the government, is sufficient to convince a rational jury that Ruth possessed PAA with intent to manufacture methamphetamine.

E. Sentencing

■ The district court calculated Ruth's offense level and criminal history to put him in the 151–188 month range under the Sentencing Guidelines. The court then sentenced Ruth to 120 months, the statutory maximum. Ruth contests some of the court's conclusions, arguing that he should instead fall into the 110–137 month range.

Ruth first argues that he should only have been sentenced based on the 10 pounds of PAA for which he actually paid and arranged delivery, not for the 110 pounds he ordered. This difference would lower his base offense level under USSG § 2D1.11(d)(1) from 28 to 26. The district court held a hearing on this issue and concluded that 28 was the appropriate offense level.

■ It is well established in this circuit that amounts of drugs that "were part of the same course of conduct or common scheme or plan as the offense of conviction, whether or not the defendant was convicted of possession or distribution of these additional amounts," may be considered in sentencing. *United States v. Vopravil*, 891 F.2d 155, 157 (7th Cir.1989); *see also Ambriz v. United States*, 14 F.3d 331, 333 (7th Cir.1994) (defendant responsible for full amount of cocaine/dirt mixture for sentencing purposes where "defendant tried to possess a large quantity of cocaine but, because of substitutions by the government, succeeded in possessing a small fraction of the whole amount"); *United States v. White*, 888 F.2d 490 (7th Cir.1989).

The government presented substantial evidence here that Ruth attempted to purchase 110 pounds of PAA, and Ruth admitted to this attempted purchase in his sentencing hearing. R.O.A., Tr. 6:28. The only reason Ruth did not obtain 110 pounds of PAA was the intervention of the DEA. The intervention of the government cannot free Ruth of responsibility for his intended purchase of 110 pounds of PAA. *White*, 888 F.2d at 498 (government intervention which reduces amount of drugs actually delivered should not affect sentence; defendant should be sentenced based on the drugs that he would have possessed had the government not intervened). Thus the district court did not abuse its discretion in adopting a base offense level of 28 based on the 110 pounds of PAA.

608

Ruth also claims that his base offense level should not have been raised two points for obstruction of justice under USSG § 3C1.1. Ruth received this increase because of his repeated failure to provide the handwriting exemplars requested by the government and ordered by the court. The court twice ordered handwriting exemplars, and Ruth twice failed to comply. Judge McKinney, who first dealt with this case,[4] held Ruth in contempt prior to trial for his ongoing obstruction of the collection of handwriting exemplars. R.O.A., Tr. 2:73. Yet Judge McKinney specifically reserved punishment on this finding of contempt, waiting until the outcome of the trial to determine whether punishment should be provided through sentencing or other means. *Id.* Given this history, Judge Tinder was correct to increase Ruth's sentence based on obstruction of justice for his failure to cooperate in providing handwriting exemplars. His decision was not an abuse of discretion and will be upheld.

In conclusion, we also note that the debate over these two sentencing issues is largely irrelevant. The extent of Ruth's claim on sentencing is that he should fall into the 110–137 month range. Given that he was only sentenced to 120 months, his claims would probably have had little impact on his sentence even if they had been successful.

For the reasons stated above the opinion of the district court is

Affirmed.

---

4. The case was later transferred to Judge Tinder, who handled the sentencing in question here.