UNITED STATES of America,
Plaintiff–Appellee,

v.

Artemio VEGA, Glenn Early, Erwin Rios,
and Adolfo Medina, Defendants–
Appellants.

Nos. 93–3074, 93–3841, 94–
1171 and 94–2780.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1995.

Decided Dec. 11, 1995.

508

Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, Daniel S. Goodman (argued), United States Department of Justice, Criminal Division, Appellate Section, Washington, DC, for Plaintiff–Appellee.

Allan A. Ackerman (argued), Chicago, IL, for Artemio Vega.

Kevin E. Milner (argued), Chicago, IL, for Glenn H. Early, Erwin Rios.

Ken DeValle (argued), Chicago, IL, for Adolfo Medina.

Before BAUER, COFFEY, and EVANS, Circuit Judges.

BAUER, Circuit Judge.

After a two-week trial, a jury convicted Artemio Vega, Glenn Early, Erwin Rios, and Adolfo Medina of conspiracy to distribute multi-kilogram quantities of cocaine in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). All four defendants appealed, raising joint and individual challenges to their convictions. We affirm.

## BACKGROUND

Vega, Early, Rios, and Medina conspired to distribute large quantities of cocaine. Unfortunately for them, another of their apparent co-conspirators—Jesse Rojo—was a cooperating witness for the Federal Bureau of

Investigation ("FBI"). In that capacity, Rojo arranged with a cocaine supplier, Noel Herrera, to transport 500 kilograms of cocaine from El Paso, Texas to Chicago. After Rojo picked up the cocaine, Herrera gave him instructions and a phone number for his contact "Charlie" in Chicago. Unbeknownst to Herrera, Rojo already had turned the cocaine over to the FBI. On March 5, 1992, Rojo and an FBI agent rendezvoused in Chicago and called Charlie. Charlie came to Rojo's hotel to pick up the cocaine. Rojo subsequently identified Charlie as defendant Vega. Vega told Rojo that he would return with the money. FBI agents then observed an Hispanic male drive the van containing the cocaine away from the hotel. Two men followed in another car. The van eventually pulled into an alley, and the van driver and another Hispanic male unloaded the boxes of cocaine into a garage on Sawyer Street. As the van drove away, a second car pulled behind and followed it back to Rojo's hotel. After a few minutes, this other car picked up the van driver and returned to the Sawyer Street garage. The FBI maintained surveillance of the three vehicles at all times.

Later, Vega called Rojo to tell him that the "spark plugs" were in the van in the hotel parking lot. The spark plug box turned out to contain not spark plugs, but $150,000 in cash. Early the next day, FBI agents, having maintained watch over the Sawyer garage, observed Vega driving away from the garage. The agents stopped Vega and asked what was in the boxes in his car. Vega claimed that the boxes contained automotive parts but gave permission for the agents to open the boxes. Not surprisingly, the boxes actually contained a white powdery substance. The agents immediately arrested Vega. Eventually, the agents discovered that Vega's car contained approximately 310 kilograms of cocaine. Subsequently, the FBI searched the Sawyer garage and seized another 190 kilograms of cocaine located in an automobile registered in Vega's name.

Rojo then returned to El Paso to give Herrera his payment for the cocaine. The two men discussed shipping a second load to Chicago. A few days later, they met and Herrera informed Rojo that law enforcement

officials had seized the first load and that Herrera needed to ship another 500 kilogram load to the same people in Chicago. Once again, Rojo was provided a van containing approximately 500 kilograms of cocaine. When he arrived in Chicago on March 15, 1992, accompanied as always by the FBI, Rojo called his contact using pre-arranged passwords. On March 16, 1992, three individuals in a brown car came to Rojo's hotel room and picked up the keys to the van. The FBI followed the van and the brown car to a business park in Addison, Illinois. The van entered a large garage on Kay Street. The brown car remained outside. A man later identified as defendant Rios approached in a champagne colored car. Rios drove toward the front entrance of the Kay Street garage. He walked to the front door, checked the mailbox, opened the door with a key, and went inside. A minute after Rios entered the garage, a motion detector planted in the cocaine was activated. A few minutes later, Rios drove away. The motion detector no longer emitted a signal after Rios left the Kay Street garage. A few minutes later, Rios re-entered the garage. Five minutes later, the motion detector was activated, indicating that the cocaine was being moved.

The FBI agents next observed the van and the brown car drive out of the garage. After driving around for a while, and stopping to make several phone calls, the two vehicles returned to Rojo's hotel. There, two individuals gave Rojo $150,000. Neither had been at Rojo's hotel room earlier. The man carrying the money was defendant Medina. Medina and the other man left the van in the hotel parking lot and drove off in the brown car. Shortly thereafter, they were arrested.

That same evening, an FBI agent saw two people leave the Kay Street garage. They locked the door and entered the champagne colored car. Several minutes later, a black car pulled up to the garage. The driver, later identified as defendant Early, entered the pedestrian doorway to the Kay Street garage. Early opened the garage door, drove into the garage, and closed the door. Approximately ten minutes later, Early drove back out in the same black car.

Early drove to a nearby shopping center where an FBI agent who had followed him approached. The agent had turned on his emergency light and activated his siren. Early and the agent got out of their cars and the agent asked Early to produce his drivers' license. Another FBI agent and a Chicago Police Department ("CPD") Detective asked Early to accompany them into another car for questioning. In the course of their conversation, Early told the agents and officer that the black car belonged to a customer of his auto shop but that he could not remember the customer's name. He refused to consent to a search of the car. However, Early did consent to a search of the Kay Street garage, and after the agents parked Early's car in the shopping center parking lot, they drove back to the Kay Street garage. While Early and the agents sat in the CPD car, Early's cellular phone rang. Rios was calling him. Early told Rios that he had been arrested and Rios swore. When Rios asked Early what car he had been driving, the officer instructed Early to hang up the phone. Early did so. Early then withdrew consent to search the garage and they all returned to the shopping center.

Shortly thereafter, a narcotics sniffing dog and its handler arrived at the shopping center and examined Early's car. The handler indicated that the dog detected the scent of cocaine in the trunk of Early's car. At that point, the FBI agent advised Early that he was under arrest on drug charges. Later, after obtaining a warrant to search Early's car, the officers discovered boxes containing 60 kilograms of cocaine in the trunk.

Finally, the agents executed a search warrant at the Kay Street garage. Inside the garage and inside the trunks of cars in the garage, the agents found large quantities of drugs and nearly $1.5 million in cash. The agents found two duffle bags of cash in a car registered to Early. In a limousine registered to Rios, the agents found 123 kilograms of cocaine. The agents also discovered 347 kilograms of cocaine in U–Haul boxes, Ziploc bags, a triple beam scale, and a utility knife.

It turned out that the Kay Street garage was leased to IM Auto. Both Rios and Early ran IM Auto. Early signed the lease and Early periodically delivered rent to the landlord. IM Auto subscribed to six cellular telephones. Cellular telephone records for March 16, 1992 show that three phone calls were made from an IM Auto cellular phone number to Rojo's hotel. Another IM Auto cellular phone number received four telephone calls from Rojo's hotel.

On March 10, 1993, a grand jury returned a three-count superseding indictment charging Vega, Early, Rios, and Medina with conspiracy to distribute multi-kilogram quantities of cocaine in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).[1] Early filed a motion to suppress evidence seized from the car he had been driving on March 16. He also sought to suppress statements that he made to agents that same night. The district court denied the motion as to evidence seized, but partially granted the motion as to statements, suppressing Early's statements made after receiving the cellular telephone call from Rios. Nevertheless, the district court admitted some of these statements at trial for the limited purpose of impeaching Early's testimony. After a two-week trial, the jury found the defendants guilty on all counts.[2]

## ANALYSIS

Three of the four appellants raise various individual and joint challenges to their convictions. Vega does not raise any individual issues but does assert the joint arguments. We address the individual issues first.

### 1. Adolfo Medina

Medina initially argues that the government failed to prove by a preponder-

---

1. The government also instituted civil forfeiture proceedings against Early and Rios.

2. The district court sentenced Vega to 292 months imprisonment and 60 months supervised release, Early to 396 months imprisonment and 60 months supervised release, Rios to 432 months imprisonment and 120 months supervised release, and Medina to 324 months imprisonment and 180 months supervised release. None of the appellants challenges his sentence in this appeal.

ance of the evidence the weight of the cocaine attributable to the conspiracy. We review the district court's calculation of the quantity of drugs attributable to a defendant for clear error. *United States v. Robinson,* 30 F.3d 774, 785 (7th Cir.1994). In a conspiracy case, the government has the burden of proof to establish by a preponderance of the evidence the quantity of cocaine attributable to the conspirators. *United States v. Crawford,* 991 F.2d 1328, 1330 (7th Cir.1993). As a member of the conspiracy, Medina was responsible for the amount of drugs he actually distributed as well as the amount involved in transactions by co-conspirators and reasonably foreseeable by him. *United States v. Smith,* 3 F.3d 1088, 1099 (7th Cir. 1993), *cert. denied,* — U.S. —, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994). Finally, the district court may base its findings as to the quantity of drugs involved in an offense on estimation. *United States v. Sturman,* 49 F.3d 1275, 1284 (7th Cir.1995).

■ At trial, a senior forensic chemist with the Drug Enforcement Agency ("DEA"), Sanford A. Angelos, testified in detail about his statistical method for weighing the cocaine. Angelos testified that he examined Exhibit 1, which consisted of 25 boxes containing 498 packages of cocaine. Angelos randomly selected 28 packages from the 25 boxes, opened each of the 28 packages, and weighed the cocaine. Each package was about the same size. The net weight of the 28 packages was 28,035.38 grams, or slightly over one kilogram per package. Based on this analysis, Angelos testified that the total weight of Exhibit 1 was slightly over 500 kilograms. Based on this scientific sampling of Exhibit 1, and his examination of the remaining cocaine, he concluded that the total weight of the cocaine was approximately 1035 kilograms.

Medina also produced his own expert who opined that Angelos' method was not reliable. Medina argues that this battle of experts left an uncertainty that should have been resolved in his favor. However, the mere battle of experts does not imply a draw. Medina produced no evidence that the quantity of cocaine Angelos tested was less than 500 kilograms. His expert did not offer his own

estimate of the weight of the cocaine. In fact, Medina's expert neither saw nor tested the cocaine. The fact that the district court sided with the government's expert is not clearly erroneous.

■ Next, Medina claims that the district court erred in removing the sole Hispanic juror for cause and replacing him with an alternate juror, all without an evidentiary hearing. Under Rule 24(c) of the Federal Rules of Criminal Procedure, we review the district court's removal of a juror for abuse of discretion. If the record shows some legitimate basis for the court's decision, there is no abuse of discretion. *United States v. Humphrey,* 34 F.3d 551, 557 (7th Cir.1994). Furthermore, we will not overturn a conviction for a Rule 24(c) violation unless appellant can show prejudice. *Id.*

■ We need not even discuss Medina's prejudice argument because we find that the record reveals a legitimate basis for the district court's removal of the juror. As reasons for removing the juror the district court stated that:

> The first is that he has manifestly disobeyed an instruction of the Court with respect to the handling of his notes. He did remove his notes from the jury room. He did not turn in his notes, was specifically warned about taking his notes out, and not only was this reported to me by the marshal, it was also reported to me by another juror.
>
> He [ha]s also persistently disobeyed the instructions of the marshal with respect to when and where to use the telephone. He has in fact not obeyed fairly elementary instructions, and I am not confident in his ability to obey the more important ones that I'm going to give sometime tomorrow.

Because these both constitute legitimate bases for removal, the district court did not abuse its discretion in removing the juror.

■ Finally, Medina argues that the district court erred in submitting to the jury a government witness' corrections to transcripts of tape-recorded conversations. Medina takes especial exception to the fact that the government's informant, Rojo, supplied translations for portions of the tape that

were unintelligible to the government's original translator. We review the district court's decision to permit written transcripts of tape-recorded conversations for abuse of discretion. *United States v. Durman,* 30 F.3d 803, 811 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 921, 130 L.Ed.2d 801 (1995). By the same token, the trustworthiness of a recording is left to the discretion of the district court. *Id.*

▮ As a general matter, we have approved the practice of sending transcripts to the jury. *Id.* Indeed, in *Durman,* we found no abuse of discretion when the district court allowed a government agent to write down his "interpretation" of the tape at any point at which the tape was unintelligible. *Id.* Furthermore, here the district court carefully instructed the jury that the transcripts were prepared by government agents and that the jury did not have to accept Rojo's interpretation of the two allegedly unintelligible phrases. Under these circumstances, the district court did not abuse its discretion.

### 2. *Erwin Rios*

▮ Rios raises two challenges to his conviction. First, he claims that the evidence was insufficient to convict. A defendant bears an extremely heavy burden in attempting to overturn a conviction on the basis of insufficient evidence. *See, e.g., United States v. Garcia,* 45 F.3d 196, 198 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2012, 131 L.Ed.2d 1011 (1995). We will reverse a conviction for insufficient evidence only if, after viewing the evidence in the light most favorable to the government, we determine that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Humphrey,* 34 F.3d 551, 555 (7th Cir.1994).

▮ Rios argues vociferously that he was convicted on the basis of mere presence at the location where the cocaine was being stored. Yet examining the evidence in the light most favorable to the government, there is much more than mere presence. First, Rios owned the limousine that was stored in the Kay Street garage and in which over 120 kilograms of cocaine were found. In addition, Rios was not merely present at the

garage on March 16, 1992. When he arrived, he unlocked the front door after checking the mailbox. Within one minute of his arrival, a motion detector hidden with the cocaine was activated. Then, after Rios left and re-entered the building, the motion detector again was activated. Furthermore, when Early told Rios that he had been arrested, Rios' response was to swear and ask Early which car he had been driving. It was reasonable for the jury to infer from this phone call and Rios' activities at the Kay Street garage that he was a member of the conspiracy.

Furthermore, there was plenty of evidence presented that suggested that Rios' company—IM Auto—was a front for the cocaine conspiracy. Rios and Early ran IM Auto, and the Kay Street garage was leased to IM Auto. Indeed, several of the phone calls to Rojo's hotel room on March 16, 1992, were from cellular phones registered to IM Auto. The IM Auto connection coupled with Rios' cellular phone call to Early, and Rios' activities at the garage amply support the jury's verdict.

Rios' next argument is based on the double jeopardy clause of the Fifth Amendment to the United States Constitution. He argues that the government's administrative forfeiture of his property barred his criminal prosecution. Because Rios did not raise this issue below, we review for plain error. *United States v. Penny,* 60 F.3d 1257, 1261 (7th Cir.1995). We have had several occasions within the last year to address similar claims. *See, e.g., United States v. Ruth,* 65 F.3d 599, 603–04 (7th Cir.1995); *United States v. Penny,* 60 F.3d at 1261–62; *United States v. Torres,* 28 F.3d 1463, 1464–66 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 669, 130 L.Ed.2d 603 (1994). This much is clear: the double jeopardy clause provides that "no person shall be subject for the same offence to be twice put in jeopardy of life or limb ..." U.S. Const. Amend. V. Furthermore, recent Supreme Court precedent indicates that parallel civil and criminal proceedings for the same offense may violate the double jeopardy clause's prohibition against successive punishments for the same offense. *See Department of Revenue v. Kurth Ranch,* —— U.S. ——, ——, 114 S.Ct. 1937, 1948, 128 L.Ed.2d

767 (1994); *Austin v. United States,* — U.S. —, —, 113 S.Ct. 2801, 2810, 125 L.Ed.2d 488 (1993); and *United States v. Halper,* 490 U.S. 435, 443, 109 S.Ct. 1892, 1899, 104 L.Ed.2d 487 (1989).

However, we have yet to address a situation where a claim such as Rios' is presented squarely for review. This is mainly because of *Torres,* wherein we held that an individual could not be placed in former jeopardy by a forfeiture proceeding when he failed to contest the forfeiture in the forfeiture proceedings. *United States v. Torres,* 28 F.3d at 1466. Since then, the appellants in *Penny* and *Ruth* have run up against *Torres* in arguing their double jeopardy claims.

█ Thus, in order to reach the merits of Rios' double jeopardy claim, we first must determine whether Rios contested the forfeiture. In September and October 1992, the FBI sent forfeiture notices to Rios advising him that the government was administratively forfeiting earlier seized property. Rios argues that he then contested the forfeiture when his wife filed a "Petition for Remission, Mitigation or Pardon of the Attempted Forfeiture." The government argues, on the other hand, that Mrs. Rios' challenge to the forfeiture was only on her behalf and that Rios, himself never contested the forfeiture.

We need not decide whether Mrs. Rios' "challenge" to the forfeiture included Mr. Rios as a party, because, as we noted in *Ruth,* a Petition for Remission and Mitigation "does not serve to contest the forfeiture, but rather is a request for an executive pardon of the property based on the petitioner's innocence or, for a wrongdoer, on a plea for leniency." 65 F.3d at 604 n. 2, (citation omitted); *see also United States v. Wong,* 62 F.3d 1212, 1214 (9th Cir.1995). Therefore, whether Mrs. Rios' petition implicitly included Mr. Rios is irrelevant. In order for double jeopardy to attach to the forfeiture proceeding, Rios would have had to file a "claim" for the property. A Petition for Remission and Mitigation is not sufficient.

### 3. *Glenn Early*

█ Early raises four challenges to his conviction. Initially, he raises the same double jeopardy claim as Rios. Like Rios, Early failed to raise this issue in the district court, so we review for plain error. *United States v. Penny,* 60 F.3d at 1261. Unfortunately for Early, he also runs into a problem identified in *Torres,* albeit a different one than Rios. In *Torres,* we reiterated that jeopardy does not attach to a civil forfeiture hearing until the beginning of the hearing "when evidence is first presented to the trier of fact." *United States v. Torres,* 28 F.3d at 1465. Where the civil forfeiture settles without a hearing, it follows that jeopardy does not attach until the district court accepts the settlement. *But see United States v. Barton,* 46 F.3d 51, 52 (9th Cir.1995) (court stated in dicta that the earliest that jeopardy attaches to a civil forfeiture action is when defendant files answer to forfeiture complaint). Early argues that because the government initiated the forfeiture case before bringing criminal charges, the forfeiture should bar any further punishment in the criminal case.

█ This assertion is factually wrong. The criminal indictment predated the forfeiture by thirteen days: July 14, 1992 versus July 27, 1992. Regardless, the pertinent date is not the initiation of the forfeiture proceedings, but the time when evidence is first presented. *United States v. Torres,* 28 F.3d at 1465. Here, Early's civil forfeiture claim was not resolved until **after** his criminal conviction. Thus, while Early may have had a double jeopardy claim as to the judgment of forfeiture, his double jeopardy challenge to his conviction fails.

█ Early next argues that the district court erred in denying his motion to suppress evidence obtained as a result of his allegedly illegal arrest. We review the district court's denial of the suppression motion for clear error. *United States v. Saadeh,* 61 F.3d 510, 516 (7th Cir.1995). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court looking at the evidence is left with the definite and firm conviction that a mistake has been made. *Id.* The resolution of a motion to suppress is necessarily fact-specific, so we give special deference to the district court that heard the testimony and observed the witnesses at the suppression hearing. *Unit-*

ed States v. James, 40 F.3d 850, 874 (7th Cir.1994), cert. denied, — U.S. —, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995).

Early's argument focuses on the characterization of his interaction with various law enforcement personnel on March 16, 1992. This characterization is crucial, because it determines what requirements the Fourth Amendment imposes on law enforcement agents. *United States v. McCarthur*, 6 F.3d 1270, 1275 (7th Cir.1993). For an arrest, the police must have probable cause to believe that a person has committed or is committing a crime. For an investigatory or "*Terry*" [3] stop, the officer need have only specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category of interactions is the consensual encounter where no degree of suspicion is required. *United States v. Nobles*, 69 F.3d 172, 179–80 (7th Cir.1995) (citations omitted).

Early argues that his initial encounter with the agents was an arrest without probable cause, or in the alternative, a *Terry* stop without reasonable suspicion. He then argues that if the encounter were a *Terry* stop, it evolved into an arrest earlier than found by the court. The government argues that the initial encounter was a *Terry* stop that only turned into an arrest after a drug sniffing dog discovered cocaine in Early's car.

We have no difficulty concluding that the agents had at least reasonable suspicion initially justifying a *Terry* stop of Early. They knew that 500 kilograms of cocaine were in the Kay Street garage. They observed Early drive into the garage, stay for ten minutes and then drive back out. These facts were sufficient to give the officers reasonable suspicion that Early was committing a crime.

Early next argues that regardless of the initial propriety of the *Terry* stop, it metamorphosed into an actual arrest because the officers drew their weapons, asked Early to accompany them in one of their cars, and stayed in the officer's vehicle for a little over an hour. Admittedly, the facts surrounding Early's stop approach the outer boundaries of a permissible *Terry* stop. A *Terry* investigative stop is "a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Smith*, 3 F.3d at 1095 (citation omitted). Nevertheless, we have over the years "witnessed a multifaceted expansion of *Terry* ... For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *United States v. Tilmon*, 19 F.3d 1221, 1224–25 (7th Cir.1994). "Unfortunately, the line between a lawful *Terry* stop and an unlawful arrest is not bright." *United States v. Smith*, 3 F.3d at 1095. In fact, "stops too intrusive to be justified by suspicion under *Terry*, but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and the duration of the restraint." *United States v. James*, 40 F.3d at 875 (citations omitted). Thus, as we pointed out in *James*, the crux of our inquiry is whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness. *Id.*

We have already determined that the officers' action was justified at its inception. Now, we must consider whether it was "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Smith*, 3 F.3d at 1095. The agents who stopped and questioned Early believed that he was involved in a massive cocaine importation conspiracy. They had every reason to believe that he was dangerous. Certainly it was reasonable for the agents to have their weapons drawn upon their initial contact. Next, it was reasonable for the agents to request that Early accompany them back to the garage to ascertain whether Early was in the process of committing a crime. For the same reason, the duration of the stop—62 minutes—was reasonable given that Early initially consented to a search of the Kay Street garage and

---

**3.** *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).

then changed his mind. In addition, part of that 62 minutes consisted of waiting for the narcotics sniffing dog to arrive. *See United States v. Sterling,* 909 F.2d 1078, 1085 (7th Cir.1990). In light of the circumstances of this case, the duration and manner of Early's stop was reasonable and therefore not tantamount to an arrest.

Next, Early contends that the district court erred in only partially suppressing Early's statements to the agents while he was in the CPD's car. The district court ruled that the statements made by Early after his cellular phone rang had to be suppressed because the agents had not given Early *Miranda*[4] warnings. Early contends that the district court did not go far enough and should have suppressed all of his statements. Not surprisingly, the government argues that the district court erred because Early was not entitled to *Miranda* warnings until he was formally arrested, and therefore none of his statements needed to be suppressed.

 We agree with the district court. *Miranda* does not apply to every interrogation, only custodial interrogation. *United States v. Burns,* 37 F.3d 276, 280 (7th Cir. 1994), *cert. denied,* ── U.S. ──, 115 S.Ct. 2592, 132 L.Ed.2d 840 (1995). Our conclusion that the interaction between Early and the officers never reached the level of an arrest for Fourth Amendment purposes is not inconsistent with the district court's suppression of the statements Early made after receiving Rios' phone call as being the subject of custodial interrogation under the Fifth Amendment. *See United States v. Smith,* 3 F.3d at 1096–1098. Our inquiry into the circumstances of temporary detention for a Fifth Amendment *Miranda* analysis requires a different focus than that for a Fourth Amendment *Terry* stop because police officers have much less discretion in Fifth Amendment cases than in Fourth Amendment cases. *Id.* at 1096–1097. With that in mind, we concur with the district court's ruling that suppressed statements Early made after receiving Rios' phone call.

Early next argues that the district court improperly admitted into evidence the very statements that it had suppressed. The district court found the suppressed statements admissible for the purpose of impeaching Early's trial testimony. *See Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *see also United States v. Cichon,* 48 F.3d 269, 275 n. 4 (7th Cir.1995), petition for *cert.* filed (May 18, 1995). Early does not quarrel with the general proposition that *Harris* permits statements suppressed under *Miranda* to be used for impeaching inconsistent trial testimony. Therefore, the question is whether the suppressed statements were inconsistent with Early's trial testimony. At trial, Early testified that he was not aware of anyone being involved with drugs. The government argued that this answer was inconsistent with Early's suppressed statements made to the police officers at the time of his arrest. Early now claims that "nothing" in his suppressed statement was "impeaching of his trial testimony." Unfortunately, Early has not seen fit to let us know which suppressed statements the district court admitted for impeachment purposes.

 The government, however, has identified at least one instance where the district court explicitly admitted suppressed statements for impeachment. On direct examination, Early testified that Rios was the caller when Early answered his cellular phone in the officer's car. However, on cross-examination, the government confronted Early with his suppressed statement that the caller had been a woman and that even though the officers could hear that the caller was a man, Early did not identify the caller as Rios. Early's trial testimony was unquestionably inconsistent with his suppressed statements and therefore the suppressed statements were admissible for impeachment purposes.

 Finally, Early argues that the district court erred in giving the jury a conscious avoidance instruction (also known as the "ostrich" instruction).[5] We review the

---

4. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. Early does not claim that the substance of the "ostrich" instruction was improper. The district court gave the following "ostrich" instruction:

district court's decision to give the "ostrich" instruction for abuse of discretion. *Nobles,* 69 F.3d at 184–85. An "ostrich" instruction is appropriate when "the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." *United States v. Jackson,* 33 F.3d 866, 874 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1316, 131 L.Ed.2d 197 (1995) (citations omitted). Examining the evidence in the light most favorable to the government, we believe that the "ostrich" instruction was justified.

Early was arrested with three boxes of cocaine in his car. At trial he testified that he did not know their contents, but was only transporting the boxes for two men who had rented space in the Kay Street garage a week earlier. In essence, Early was just doing a favor for a couple of strangers when he was caught with the cocaine. Assuming that the jury believed the story at all, they easily could believe that Early was consciously avoiding the strong signals that the two renters of the garage space were involved in shady dealings. Therefore, the "ostrich" instruction was appropriate.

### 4. *Joint Issues*

■ All four appellants raise two joint challenges to their convictions. Neither of these arguments has any merit. First, the appellants claim that the district court erred in allowing the jury to consider the indictment even though the conspiracy count contained 32 paragraphs alleging specific overt acts committed by the defendants in furtherance of their conspiracy. We review the district court's decision to give the jury a copy of the indictment for abuse of discretion. *United States v. Watts,* 29 F.3d 287, 291 (7th Cir.1994).

■ Relying on *United States v. Shabani,* —— U.S. ——, 115 S.Ct. 382, 130 L.Ed.2d

225 (1994), in which the Supreme Court held that 21 U.S.C. § 846 does not require proof of an overt act, the appellants argue that the district court erred in permitting the jury to consider evidence of overt acts. This does not follow. To say that the government **need** not prove an overt act does not mean that the government **may** not prove overt acts. Furthermore, the district court instructed the jury that the indictment was not evidence and did not create an inference of guilt. Therefore, the submission of the un-redacted indictment to the jury was proper.

■ Finally, appellants raise two challenges to the district court's *Pinkerton* [6] instruction, neither of which has any merit. Appellants complain that the *Pinkerton* instruction is flawed because it was "preemptory" (sic) and "conjunctive." In relevant part, the district court gave the following *Pinkerton* instruction:

A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of or as a natural consequence of the conspiracy.

Therefore, if you find defendants Artemio Vega, Erwin Rios, Adolfo Medina, and Glenn Early guilty of the conspiracy charged in Count 1 and if you find beyond a reasonable doubt that while they were conspiring with each other one of them committed the offense in Counts 2 or 3 in furtherance of the conspiracy, then you should find that defendant guilty of Counts 2 or 3.

The appellants do not cite Seventh Circuit precedent in support of their argument that "should" in the second paragraph is erroneous. First, "should" comes directly from the Seventh Circuit's pattern jury instructions. *See* III *Federal Criminal Jury Instructions*

---

It is the defendant Glenn Early's theory of the defense that he had no knowledge of the contents of the three U–Haul boxes he possessed on March 16, 1992. With regard to Defendant Early, you may infer knowledge from a combination of suspicion and indifference to the truth.

If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet deliberately shut his or her eyes for fear of what he or she would learn, you may conclude that he or she acted knowingly as I have used that word.

**6.** *See Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946).

*of the Seventh Circuit* 7 (West 1986). If this were not enough, we have explicitly approved the use of "should" in this context. *United States v. Sax*, 39 F.3d 1380, 1388–89 n. 5 (7th Cir.1994). We see no reason to alter that position.

The appellants' challenge to the first quoted paragraph from the *Pinkerton* instruction fails for the same reason. They assert that the last line should read "**and** as a natural consequence of the conspiracy" rather than "**or** as a natural consequence of the conspiracy." While this argument might carry some weight in the Third Circuit,[7] it is a nonstarter in the Seventh. Again, the instruction as given comes from the Seventh Circuit's pattern jury instructions. More importantly, we have specifically upheld its use in *Sax*, 39 F.3d at 1388–89 n. 5. We see no reason to change course.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

---

7. *See, e.g., United States v. Turcks*, 41 F.3d 893, 897–98 (3d Cir.1994), *cert. denied,* ⸺ U.S. ⸺, 115 S.Ct. 1716, 131 L.Ed.2d 575 (1995).