UNITED STATES of America,
Plaintiff–Appellee,

v.

Rudolfo SANTOYO, Defendant–Appellant.

No. 97–2096.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1998.

Decided June 16, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 18, 1998.

Bennett E. Kaplan (argued), Scott R. Lassar, Office of the United States Attorney, Criminal Division, Chicago, IL, Eddie A. Stephens, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

John T. Moran, Jr. (argued), Chicago, IL, for Defendant–Appellant.

Before FLAUM, ROVNER, and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

Rudolfo Santoyo pleaded guilty to one count of conspiring to possess cocaine with the intent to distribute in violation of 21 U.S.C. § 846. In a post-indictment interview, Santoyo provided information that helped to convince the Government not to go forward with a prosecution against co-defendant Juan Urcino. At Santoyo's sentencing hearing, however, the Government did not bring a departure motion pursuant to USSG § 5K1.1 because the Government did not believe that Santoyo's interview constituted "substantial assistance" within the meaning of that Guideline.[1] Santoyo moved for a departure on this basis anyway, but the district court stated that it had no authority to entertain such a motion unless it came from the Government. The district court also rejected Santoyo's invitation to depart under USSG § 5K2.0 on the asserted ground that his case fell outside the heartland because, *inter alia*, government agents allegedly "cajoled" him into committing the offense. On appeal, Santoyo argues that the district court should have departed on either of these grounds. He also claims that the Government's refusal to file a departure motion under § 5K1.1 was arbitrary and unreasonable, or, in the alternative, that conditioning a departure under § 5K1.1 upon the Government's motion violates the constitutional principle of separation of powers. We affirm Santoyo's sentence.

## I.

On March 26, 1996, Rudolfo Santoyo told one of the Government's confidential informants (CI) that he knew of a man who was willing to sell twenty kilograms of cocaine. Santoyo offered to arrange a meeting between this supplier and the CI. On March 29, Santoyo again offered to introduce the CI to the supplier, who had recently imported a large shipment of cocaine and was looking for customers. In two separate telephone conversations on April 2, Santoyo discussed the sale of cocaine with the CI. As a result of these conversations, Santoyo arranged a meeting for that night between himself, Jesus "Jesse" Diaz (Santoyo's supplier), the CI, and one of the CI's "associates" (an undercover DEA agent).

Santoyo arrived at the meeting with Jesse Diaz. During the course of this meeting, Santoyo and Diaz stated that they could deliver twenty kilograms of cocaine to the CI's associate in Berwyn, Illinois (the conspirators' hometown) at a cost of $20,500 per kilogram, but that the price per kilogram would jump to $21,500 if the delivery was made to the associate in Palatine, Illinois. Diaz bragged that he could easily handle this order because his uncle was "sitting on" 150 kilograms of cocaine. The meeting broke up, and the participants agreed to keep in touch by pager and telephone to arrange further meetings. Santoyo and Diaz promised to provide the DEA agent with a free sample of cocaine at their next meeting after they made final arrangements to obtain the cocaine from Diaz's uncle.

Santoyo paged the DEA agent on April 9 and, during a subsequent recorded conversation, told the agent that he wanted to arrange another meeting to discuss their cocaine transaction. In this conversation, Luis Huerta—the conspiracy's source of cocaine and Diaz's uncle—spoke to the agent and expressed his intention to complete the sale of twenty kilograms on the following day. Santoyo was unable to attend the meeting on April 10, but Huerta and Diaz met the DEA agent and yet another undercover agent as promised. In a recorded conversation, the agents expressed their desire to purchase

---

1. Nothing in the parties' plea agreement obligated the Government to bring a motion to depart under § 5K1.1.

forty kilograms of cocaine now and, if this deal went well, they would be interested in buying twenty to forty kilograms every two weeks. Huerta claimed that he could deliver forty kilograms for $21,500 per kilogram.

Two weeks later, the two undercover DEA agents met with Diaz and Huerta at a local mall to complete the first forty-kilogram sale. Huerta's friend, Juan Urcino, accompanied Huerta and Diaz to the mall because he wanted to buy a purse for his girlfriend; Urcino agreed to wait in the car while Huerta and Diaz took care of some unspecified business. The agents told Huerta that his money was waiting in a motel room in Addison, Illinois, and one of the agents took Diaz to retrieve the money. During this time, Huerta showed the other agent a large green bag containing multiple kilograms of cocaine. At this point, law enforcement officers swarmed to arrest Huerta, and Urcino quickly fled the scene at Huerta's urging. All defendants, including Urcino, were arrested in short order; law enforcement officials arrested Santoyo at his place of employment.

In post-arrest statements, Santoyo admitted that he brokered the deal between Diaz/Huerta and the government agents in return for a monetary commission. Diaz told law enforcement officials that Santoyo contacted him about selling cocaine to the undercover agents; based on this contact, he recruited his uncle, Luis Huerta, as a supplier. Finally, Huerta admitted that he agreed to supply Diaz and Santoyo with multiple kilograms of cocaine to sell to the undercover government agents. All three defendants were indicted on conspiracy and possession charges.

The grand jury also indicted Juan Urcino on these charges, but the Government subsequently dismissed the indictments against Urcino for want of evidence. Urcino gave a statement following his arrest in which he denied any knowledge of his codefendants' drug transaction. He claimed that he only accompanied Diaz and Huerta to the mall in order to buy a purse for his girlfriend (which

he did). Santoyo passed a polygraph examination in which he said he "could not say if Urcino at any time knew exactly what was going on" regarding the conspiracy. Diaz's statement to government agents was more definitive and supported Urcino's story that the men never informed Urcino of the purpose for their trip to the mall.

Santoyo pleaded guilty to the conspiracy charge and moved the district court to depart downward from the applicable sentencing range on three potential grounds. First, he claimed that, despite the Government's failure to file a motion under USSG § 5K1.1, the court should nevertheless depart based on his substantial assistance in the Juan Urcino matter. The district court deemed itself without discretion to depart according to § 5K1.1 without a motion from the Government. Second, Santoyo claimed that a departure was warranted because his criminal history overrepresented the seriousness of his criminal background. *See* USSG § 4A1.3. His argument on this point simply highlighted the fact that his prior crimes removed him from consideration for the mandatory minimum sentence pursuant to the "safety valve" provision of USSG § 5C1.2(5); the district court exercised its discretion to deny a departure on this basis. Finally, Santoyo argued that the government agents' alleged efforts in "cajoling" him to introduce the CI to a cocaine supplier, as well as assorted other factors (including those pleaded in support of his other grounds for departure), warranted a departure under § 5K2.0. He did not assert that he was entrapped (nor could he in light of his plea of guilty), but he argued that his case was removed from the heartland because the CI "kept seeking" Santoyo to broker a cocaine sale. The district court found this allegation insufficient to take the case out of the heartland and, thus, rejected Santoyo's motion to depart.

## II.

Santoyo makes two series of claims on appeal.[2] First, he argues that the district

2. It is unclear whether Santoyo argues on appeal that the district court also erred by refusing to exercise its discretion to depart pursuant to USSG § 4A1.3, which permits departures when a

defendant's criminal history category overrepresents the seriousness of his criminal history or the likelihood that he will commit further crimes. To the extent he advances this argument, we

court had the power to depart pursuant to § 5K1.1 without a motion by the Government. He makes two related, alternative claims in this regard: (1) The Government's failure to make a departure motion under § 5K1.1 was unconstitutionally arbitrary and unreasonable, and . (2) the inability of the court to consider a § 5K1.1 departure in the absence of a motion by the Government violates the Constitution's separation of powers principle. Second, he claims that the district court should have departed because the circumstances of his case fell outside the heartland of cases contemplated by the Sentencing Guidelines. *See* USSG § 5K2.0. We reject all of these claims and affirm Santoyo's sentence.

### A. Section 5K1.1—Substantial Assistance to Authorities

■ Santoyo argues that the district court should have departed because he gave substantial assistance to federal law ·enforcement officials. He claims that telling government agents that he "could not say" that Juan Urcino knew of the cocaine conspiracy was instrumental in the Government's decision to dismiss the indictment against Urcino. Section 5K1.1 permits a downward departure if a defendant offers substantial assistance to authorities, but only if the Government moves the court to make such a departure:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

Once the Government makes a motion under this Guideline, the court is directed to deter-mine the appropriate level of departure in light of a number of factors enumerated by the Sentencing Commission. Until the Government makes that motion, though, a court is without power to depart under § 5K1.1. A long and unbroken line of cases has recognized this essential prerequisite. *See, e.g., Melendez v. United States*, 518 U.S. 120, 125–26, 116 S.Ct. 2057, 135 L.Ed.2d 427 (1996); *United States v. King*, 62 F.3d 891, 893 n. 1 (7th Cir.1995); *United States v. Kelly*, 14 F.3d 1169, 1177 (7th Cir.1994); *United States v. Burrell*, 963 F.2d 976, 985 (7th Cir.), *cert. denied*, 506 U.S. 928, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992); *see also United States v. Isaac*, 141 F.3d 477, 480–81 (3d Cir. 1998); *United States v. Benjamin*, 138 F.3d 1069, 1073 (6th Cir.1998); *United States v. Avellino*, 136 F.3d 249, 260 (2d Cir.1998); *United States v. Price*, 95 F.3d 364, 367 (5th Cir.1996); *United States v. White*, 71 F.3d 920, 923 (D.C.Cir.1995); *United States v. Cueto*, 9 F.3d 1438, 1442 (9th Cir.1993). There is no question, therefore, that the district court did not err in refusing to depart under § 5K1.1 in the absence of a Government motion.

■ In addition to this primary argument, Santoyo raises two alternative claims relating to a departure for substantial assistance. First, he argues that the Government's failure to file a motion to depart under § 5K1.1 was arbitrary and unreasonable. The Government's refusal to file a substantial-assistance motion is reviewable only for unconstitutional motive. *See, e.g., Wade v. United States*, 504 U.S. 181, 185–86, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992); *United States v. Carter*, 122 F.3d 469, 476 (7th Cir.1997). , Santoyo's claim of arbitrariness, therefore, can be styled as a due process challenge.[3] There is, however, a ration-

---

reject it because the district court's discretionary sentencing decision in this regard is unreviewable. *See, e.g., United States v. Jarrett*, 133 F.3d 519, 535 (7th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 1688, 140 L.Ed.2d 824 (1998).

**3.** We have noted in the past that substantive due process claims of this nature are highly disfavored. *See, e.g., United States v. Smith*, 953 F.2d 1060, 1064–65 (7th Cir.1992). The Supreme Court, however, has commented in dicta that defendants are entitled to attack a prosecutor's refusal to make a § 5K1.1 departure motion as

irrational or withheld in bad faith. *See Wade v. United States, 504 U.S. 181, 186, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992)* ("As the Government concedes ... Wade would be entitled to relief if the prosecutor's refusal to move was not rationally related to any legitimate Government end...."). We have alternatively considered such claims, *see, e.g., United States v. Senn, 102 F.3d 327, 333 (7th Cir.1996); United States v. King, 62 F.3d 891, 894 n. 2 (7th Cir.1995),* and held that "arbitrariness" is not a proper basis for a constitutional challenge to the prosecutor's refusal to file a departure motion, *see, e.g., United*

al basis for the prosecutor's assessment that Santoyo did not deserve a departure based on his assistance in the Urcino matter. Santoyo offered no affirmative information to government agents; he said only that he "could not say" Urcino was involved in the conspiracy. Urcino himself gave a statement in which he disavowed any knowledge of his co-defendants' criminal activities, and Jesse Diaz's statement to government agents corroborated Urcino's account. It was not completely irrational or indicative of bad faith, under these circumstances, for the Government to determine that Santoyo's assistance in the prosecution of Urcino was insufficiently substantial to warrant a departure under § 5K1.1.

■ In his second alternative claim, Santoyo argues that the Government-motion requirement of § 5K1.1 assigns an unconstitutional degree of power to the Executive Branch in derogation of the separation of powers. Specifically, he claims that the Sentencing Commission exceeded its statutorily-granted authority in establishing the requirement. We have expressly rejected this claim in the context of due process challenges; Santoyo contends that his case presents a different challenge, but the source of the alleged due process violations in those cases was the very same separation-of-powers argument asserted by Santoyo in this appeal. *See United States v. Griffith*, 85 F.3d 284, 291 (7th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 272, 136 L.Ed.2d 195 (1996); *United States v. Valencia*, 913 F.2d 378, 386 (7th Cir.1990); *United States v. Lewis*, 896 F.2d 246, 247–49 (7th Cir.1990); *see also United States v. Cueto*, 9 F.3d 1438, 1441–42 (9th Cir.1993); *United States v. Doe*, 934 F.2d 353, 359–60 (D.C.Cir.), *cert. denied*, 502 U.S. 896, 112 S.Ct. 268, 116 L.Ed.2d 221 (1991). Santoyo asks us in this case—as did the defendants in the aforementioned cases—to hold that the Sentencing Commission exceeded its statutory mandate by creating a Government-motion requirement for § 5K1.1 departures. We once again refuse to do so.

Congress provided broad guidance to the Sentencing Commission in the Sentencing Reform Act of 1984, 28 U.S.C. § 994, and left the Commission free to establish procedures to implement its policies. For instance, in the provision relevant to the instant appeal, § 994(n) instructs:

> The Commission shall assure that the guidelines reflect the general appropriateness of imposing a lower sentence than would otherwise be imposed, including a sentence that is lower than that established by statute as a minimum sentence, to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.

The Commission deemed a Government-motion requirement in USSG § 5K1.1 to be the best way to effectuate Congress's goals as expressed in § 994(n).

■ We must defer to the Commission's interpretation of the scope of § 994(n) unless that interpretation is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Lewis*, 896 F.2d at 247. Section 994(n) requires only that the Guidelines recognize the "general appropriateness" of departures for substantial assistance; it does not require courts to consider defendants' assistance in every case or otherwise foreclose the Commission from imposing conditions on those departures, such as a Government motion. *See Lewis*, 896 F.2d at 247. It is a quite logical and reasonable determination that the "authorities" themselves can best assess whether a defendant has provided "substantial assistance to the authorities." Moreover, along with § 994(n), Congress enacted parallel provisions that empowered district courts to reduce a defendant's sentence based on substantial assistance, *both of which* condition the power on a Government motion. In 18 U.S.C. § 3553(e), Congress granted the authority to district courts—upon a Government motion—to impose a sentence below the statutory minimum in consideration of a defendant's substantial assistance; as another part of the Sentencing Reform Act of 1984, Congress approved an amendment to

*States v. Kelly*, 14 F.3d 1169, 1177 (7th Cir. 1994); *Smith*, 953 F.2d at 1065–66.

Federal Rule of Criminal Procedure 35(b) stating that a district court may reduce a defendant's sentence based on post-sentencing substantial assistance "in accordance with the guidelines and policy statements," but leaving unchanged the Rule's pre-existing Government-motion requirement. As we said in *Lewis*, "[t]his, in itself, shows that it was reasonable for the Sentencing Commission to include the Government motion requirement in § 5K1.1." 896 F.2d at 248. We therefore conclude (once again) that the Government motion requirement does not impermissibly infringe upon the constitutionally-mandated separation of powers.

For these reasons, we deny Santoyo's claims relating to the district court's refusal to depart pursuant to § 5K1.1.

### B. Section 5K2.0—Heartland

██ Santoyo also argues that the district court should have granted his motion to depart under USSG § 5K2.0 because his case fell outside the heartland of cases contemplated by the Sentencing Commission. The "heartland" is the "set of typical cases em-

bodying the conduct that each guideline describes." USSG Ch. 1, Pt. A(4)(b), intro. comment. When a court makes this determination of typicality, it must consider "the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole." *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996) (quotation omitted). The Sentencing Commission views this departure power as quite limited and expects "that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent'." *Id.* (quoting USSG Ch. 1, Pt. A(4)(b), intro. comment). We review a district court's evaluation of whether a particular set of facts takes a case outside the heartland for an abuse of discretion.[4] *See Koon*, 116 S.Ct. at 2047–48; *United States v. Almaguer*, 146 F.3d 474, 475 (7th Cir.1998).

██ Santoyo claims that his case falls outside the heartland based on a conclusory allegation that government agents "cajoled" him into introducing them to a cocaine supplier like Diaz or Huerta.[5] Santoyo does not

---

4. As the *Koon* Court noted, "[l]ittle turns, however, on whether we label review of this particular question abuse of discretion or *de novo*, for an abuse of discretion standard does not mean a mistake of law is beyond appellate correction. A district court by definition abuses its discretion when it makes an error of law." 116 S.Ct. at 2047 (citation omitted).

5. This is the primary basis of Santoyo's claim for departure under § 5K2.0. Nevertheless, he also incorporates into his heartland argument all of his prior bases for departure, as well as a generalized plea for mercy. In addition to the governmental misconduct argument, he contends that his case falls outside the heartland because he offered substantial assistance to the authorities, because his criminal history category over-represents his criminal background, and because a sentence at the statutory minimum would adequately promote the "goals of sentencing" as described in 18 U.S.C. § 3553(a).

Working backwards, a case does not fall outside the heartland simply because a district court might viscerally feel that the Guidelines prescribe a sentence that is too high for a particular defendant. Santoyo argues that there is "tension" between his Guideline-mandated sentence and the purposes of sentencing enumerated in § 3553(a). The Guidelines were specifically enacted, however, to prevent this balancing of equities in each case, which would likely result in widely disparate sentences for identical criminal

conduct. If a district court had free rein to resolve such "tension" in each case, the uniformity of sentences sought by the Guidelines would be completely destroyed.

Moreover, the district court earlier rejected Santoyo's claim that he deserved a downward departure under USSG § 4A1.3 because his criminal history category allegedly overrepresented his criminal background. If this factor could not support a discretionary departure under § 4A1.3, *a fortiori*, it could not be present to a degree "not adequately taken into consideration by the Sentencing Commission in formulating" that Guideline. USSG § 5K2.0, p.s.

Finally, along that same line, Santoyo contends that his assistance to the Government was so substantial that he deserved a departure under USSG § 5K1.1. Because the Government refused to file a departure motion under that provision, however, this avenue of departure was closed to him. Still, he argues, his assistance to the Government was so substantial that it justified a departure under § 5K2.0. In order to prevail on this § 5K2.0 claim, as stated above, Santoyo would have to prove that he offered assistance that is so unusual in type or degree as to take it out of the heartland of § 5K1.1 cases contemplated by the Sentencing Commission (which would have garnered him the § 5K1.1 departure in the first place and obviated the need for a departure under § 5K2.0). *See, e.g., United States v. Otis*, 107 F.3d 487, 490 (7th Cir.1997). Santoyo told

further develop this point; there is no description of how, when, or where the agents cajoled him, much less a claim of his lack of predisposition or a claim that the Government used tactics in violation of the Due Process Clause in order to persuade Santoyo to commit his crime. In fact, the Government's confidential informant claimed that it was Santoyo who repeatedly bragged about his connections to cocaine dealers and ability to broker deals. The district court concluded that the extent of the alleged "cajoling" was not so unique as to remove this case from the heartland of drug offenses. In light of the paucity of evidence (or even allegations, for that matter) suggesting governmental misconduct, the district court did not erroneously conclude that this case fell within the heartland.

For all of the foregoing reasons, we affirm Santoyo's sentence.

government agents that he "could not say" whether Juan Urcino knew of the conspirators' criminal activities. This is a far cry from the level of assistance required to remove a case from the heartland of § 5K1.1 cases.