In the
United States Court of Appeals
For the Seventh Circuit

Nos.  98-1252, 98-2053, 98-2508,
98-2709 & 98-4060

United States of America,

Plaintiff-Appellee,

v.

Roberto Febus, a/k/a Bobby Santos; Efrain Santos,
a/k/a Frank Santos, a/k/a Puerto Rican Frank;
Benedicto Diaz, a/k/a Ito; Jose Santos; and
Angel Morales, a/k/a Wiso,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 96 CR 44--James T. Moody, Judge.

Argued/* October 28, 1999--Decided July 14, 2000

Before Ripple, Manion, and Evans, Circuit Judges.

Manion, Circuit Judge.  Efrain Santos, Roberto
Febus, Benedicto Diaz, Angel Morales, and Jose
Santos ran an illegal lottery. For their roles, a
jury convicted Efrain Santos and Febus of
conspiracy to conduct an illegal gambling
enterprise, and of conducting an illegal gambling
enterprise. The jury also convicted Efrain Santos
of laundering the proceeds of the illegal
lottery. Diaz and Morales pleaded guilty to
conspiracy to launder the gambling proceeds. And
Jose Santos/1 was convicted of conspiracy and of
aiding and abetting an illegal gambling business.
All defendants appeal, and we affirm.

I.

   Efrain Santos operated an illegal lottery, known
as a "bolita," in East Chicago, Indiana from the
1970's until 1994. He based the bolita's winning
numbers on the daily Pick Three and Pick Four
Illinois lottery games, and on the Puerto Rican
Lottery. He first worked for a man named Ken Eto
who ran a larger bolita in Indiana and Illinois
in the late 1960's and early 1970's, until Santos
took over the Indiana operation in the 1970's.

While Santos was in prison on narcotics charges during the late 1970's and early 1980's, Roberto Febus served as the bolita's interim leader until Santos returned in 1984.

In Santos's bolita, runners accepted bets primarily in bars and restaurants in East Chicago, withheld their commissions from the cash, and delivered the money to the collectors, Benedicto Diaz and Angel Morales. Diaz and Morales collected the betting slips and money from the runners at a bar and delivered the proceeds to Santos. Santos used some of the proceeds to pay the salaries of Diaz and Morales, and to pay the bolita's winners.

The FBI and IRS began investigating the bolita in January 1992. On March 30, 1993, the FBI searched Santos, his residences and vehicles, as well as Diaz and Morales and their vehicles, and discovered betting slips, ledgers, cash and other evidence of a gambling enterprise. Although the lottery shut down for a couple of weeks after the search, Diaz and Morales resumed the operation by collecting at a different location. On June 22, 1993, the FBI searched Santos, Diaz and Morales again, and found further evidence of the illegal gambling scheme. But even after this second search, the lottery continued. And after conducting a third search on October 12, 1993, the FBI discovered more betting slips, cash, and other evidence of the bolita.

Presented with this and other evidence, a federal grand jury returned a ten-count indictment against Santos, Febus, Diaz and Morales. Count 1 charged them with conspiracy to conduct an illegal gambling business from January 1989 to December 1994, in violation of 18 U.S.C. sec. 371. Count 2 charged the defendants with conducting an illegal gambling business, in violation of 18 U.S.C. sec. 1955. Count 3 charged Santos, Diaz, and Morales with conspiracy to use the proceeds of an illegal gambling business to promote the carrying on of the business, in violation of 18 U.S.C. sec. 1956(h). Count 4 charged Santos and Diaz with money laundering by completing a financial transaction with the proceeds of the illegal gambling business with the intent to promote the carrying on of the business, in violation of 18 U.S.C. sec. 1956(a)(1)(A)(i). Count 5 charged Santos and Morales with money laundering to promote the gambling business, in violation of 18 U.S.C. sec. 1956(a)(1)(A)(i). And Counts 6-10 constituted more money laundering charges.

A jury convicted Santos of Counts 1 through 5, and Febus of Counts 1 and 2; the district court sentenced Santos to 210 months in prison, and

Febus to 30 months in prison.

Diaz pleaded guilty to Count 3 and, as part of his plea agreement, the government dismissed the other counts against him and agreed to recommend a downward departure (under sec.5K1.1 of the Sentencing Guidelines) in exchange for his truthful testimony against his co-defendants. Diaz testified at Santos's trial, but the government declined to file the sec.5K1.1 motion, concluding that his testimony was inconsistent, untruthful, and bolstered his co-defendants' defense. Diaz moved to withdraw his plea agreement, alleging that the government breached it by failing to file the sec.5K1.1 motion, but the district court denied his motion and sentenced him to 108 months in prison.

Like Diaz, Morales pleaded guilty to Count 3, entered into an identical plea agreement, and testified at Santos's trial. The government filed the sec.5K1.1 motion, and then called him to testify at Santos's sentencing hearing as well. After Morales testified inconsistently at the sentencing hearing, the government moved to withdraw its sec.5K1.1 motion, which the district court granted. Morales filed a motion to reconsider, which the district court denied and sentenced him to 151 months in prison. This consolidated appeal followed.

II.

A.  Efrain Santos

Efrain Santos appeals only his money laundering convictions, arguing that the evidence was insufficient to convict him of money laundering because his cash payments to the bolita's collectors and winners were essential transactions of the illegal gambling business, and thus cannot also constitute transactions under the promotion provision of the money laundering statute, 18 U.S.C. sec. 1956(a)(1)(A)(i).

"A defendant bears an extremely heavy burden in attempting to overturn a conviction on the basis of insufficient evidence;" United States v. Vega, 72 F.3d 507, 513 (7th Cir. 1995), and we will reverse a conviction "only if, after viewing the evidence in the light most favorable to the government, we determine that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." Id. Title 18 U.S.C. sec. 1956(a)(1)(A)(i) of the money laundering statute provides:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of

some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

(A)(i) with the intent to promote the carrying on of specified unlawful activity [shall be punished].

To prove money laundering under this promotion provision, the government must show that the defendant: 1) conducted a financial transaction with the proceeds of an illegal activity; 2) knew that the property represented illegal proceeds; and 3) conducted the transaction with the intent to promote the carrying on of the unlawful activity. United States v. Emerson, 128 F.3d 557, 561 (7th Cir. 1997).

While Santos acknowledges that he used illegal proceeds to pay the bolita's collectors and winners, he contends that his transactions merely completed the substantive offense of illegal gambling, and thus did not "promote the carrying on" of the bolita. He claims that since the money laundering statute created the separate crime of money laundering, it only punishes the practice of reinvesting the proceeds of an already completed unlawful activity to promote the expansion of that unlawful activity, and thus the government failed to prove that his transactions satisfied the statute's promotion requirement.

A transaction satisfies the promotion provision of the money laundering statute if it constitutes "the practice of plowing back proceeds of [the illegal activity] to promote that activity." United States v. Jackson, 935 F.2d 832, 842 (7th Cir. 1991). In Jackson, we affirmed a money laundering conviction in which a defendant, Joseph Davis, used the proceeds of drug transactions to purchase telephone paging beepers that were used to contact drug couriers and instruct them on the location of additional money pickups. We determined that since Davis purchased the beepers with the intent to promote the continued prosperity of his criminal enterprise by plowing money back into his drug operation, he violated sec. 1956(a)(1)(A)(i) of the money laundering statute. Id. at 841. According to Jackson, therefore, the money laundering statute created a separate crime of money laundering that is distinct from the substantive offense (in this case gambling) that initially generated the illegal funds, see United States v. Heaps, 39 F.3d 479, 486 (4th Cir. 1994); and it punishes transactions that promote the continued prosperity of the underlying offense. See United States v. Conley, 37 F.3d 970, 979 n. 12 (3d Cir. 1994) (evidence of the defendant's use of illegal

gambling proceeds to pay vendors to service illegal poker machines constituted an offense under the promotion provision of 18 U.S.C. sec. 1956(a)(1)).

In this case, the government established that Santos reinvested the bolita's proceeds to ensure its continued operation for over 5 years, well beyond the 30 days required to complete the substantive offense of illegal gambling under 18 U.S.C. sec. 1955. Furthermore, his own records show that the income to his bolita expanded from approximately $250,000.00 per year for the years 1989 to 1992, to $330,000.00 for 1993, and up to $410,000.00 for 1994. His payments to his collectors, Diaz and Morales, compensated them for collecting the increased revenues and transferring those funds back to him. And his payments to the winning players promoted the bolita's continuing prosperity by maintaining and increasing the players' patronage. See United States v. Cole, 988 F.2d 681, 684 (7th Cir. 1993) (the defendant's payment of "interest" to defrauded investors promoted the fraudulent investment scheme.). Therefore, the government produced sufficient evidence to enable a reasonable jury to find Santos guilty of money laundering beyond a reasonable doubt./2

B.   Benedicto Diaz
  Benedicto Diaz appeals the district court's denial of his motion to withdraw his plea agreement, arguing that since his testimony fulfilled his side of the bargain by assisting the convictions of his co-defendants, the government breached the agreement by failing to file a downward departure motion for him under sec.5K1.1./3

We review the district court's denial of a motion to withdraw a guilty plea for abuse of discretion. United States v. Schilling, 142 F.3d 388, 394 (7th Cir. 1998). A court may permit a defendant to withdraw a guilty plea if the defendant provides "any fair and just reason." Id. at 398 (citing United States v. Abdul, 75 F.3d 327, 329 (7th Cir. 1996)). And we will uphold the district court's findings about whether the defendant has provided a fair and just reason unless they are clearly erroneous. Schilling, 142 F.3d at 398.

In this case, Diaz's plea agreement provided in part:

I further understand that at the time of sentencing, in exchange for my cooperation, the United States of America will file a departure motion with the Court pursuant to guideline section 5K1.1 and Title 18, United States Code,

Section 3353(e); I further understand that if the Court accepts this plea agreement and grants the government's 5K1.1 motion, the government will recommend a departure which places my final guideline sentencing range between level 1 to level 15 on the guideline sentencing table. However, I understand that this recommendation is based upon my continuing cooperation with the United States and my agreement to always provide truthful and complete information and testimony; I also understand that if I fail to provide complete, truthful and candid information and testimony as required by this plea agreement, the government will not be obligated to file the departure motion and I will not be allowed to withdraw my guilty plea.

(Plea Agreement para.9(i).) At his plea hearing, Diaz also acknowledged that if he failed to testify "fully and completely and truthfully," the government would have no obligation to file the departure motion. Thus, under the terms of the agreement, the government validly conditioned its obligation to file the sec.5K1.1 motion on Diaz's "complete, truthful and candid" testimony. See United States v. Lezine, 166 F.3d 895, 901 (7th Cir. 1999).

At the trial, Diaz testified that he never really thought that the lottery was illegal./4 The district court found that Diaz's trial testimony was inconsistent with earlier statements he made under oath, and bolstered the defense of his co-defendants. His trial testimony contradicted: 1) his plea hearing (where he admitted that he knowingly conspired to launder the proceeds of an illegal enterprise); 2) his earlier statements to co-conspirators about his fear of going to jail for participating in the lottery; and 3) his earlier admission to an FBI agent that he knew that the bolita was illegal after the FBI's March 30, 1993 search. And the fact that Diaz moved his collection operations to another bar after the FBI search further demonstrates that he knew that the lottery was illegal at that time. Moreover, his trial testimony supported Santos's defense theory that Santos and his co-conspirators had always thought that the lottery was legal. Therefore, the district court did not commit clear error in finding that Diaz failed to testify completely or truthfully.

The "overarching theme" of Diaz's plea agreement was his complete, truthful, and candid testimony. See United States v. Ramunno, 133 F.3d 476, 483 (7th Cir. 1998). Since he failed to fulfill his part of the bargain, and supported the defense of his co-defendants instead, the government was not required to move for a downward departure

pursuant to sec.5K1.1. Diaz's breach of the plea agreement does not constitute a "fair and just" reason to withdraw his plea, and thus the district court did not abuse its discretion in denying his motion.

C. Angel Morales

On appeal, Morales argues that he was denied: 1) his right to an interpreter in violation of the Court Interpreter's Act; 2) his Sixth Amendment right to counsel when he appeared to testify at Santos's sentencing hearing; and 3) his Sixth Amendment right to the effective assistance of counsel.

1. The Court Interpreter's Act.
Morales argues that since English is not his primary language, he was denied his right to an interpreter in violation of the Court Interpreter's Act, 28 U.S.C. sec. 1827. The Act requires the court to provide an interpreter for a defendant who primarily speaks a language other than English, 28 U.S.C. sec. 1827(d)(1)(A); its purpose is to ensure that the defendant can comprehend the proceedings and communicate effectively with counsel. United States v. Sanchez, 928 F.2d 1450, 1455 (6th Cir. 1991). Since this issue "hinges on a variety of factors, including the defendant's knowledge of English and the complexity of the proceedings and testimony, the trial judge, who is in direct contact with the defendant, must be given wide discretion." Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989); see also Sanchez, 928 F.2d at 1455.

Morales first contends that he was unable to comprehend his plea colloquy without an interpreter, and thus he did not knowingly and voluntarily waive his right to appeal his sentence. According to Morales, the following exchange demonstrates that it was difficult for him to comprehend his waiver:

Q And if I [the district court] sentence you within the appropriate range, are you giving up or waiving your right to appeal your sentence on any ground and also agreeing not to contest your sentence in any post-conviction proceeding?

A No.

Q You're not. Read paragraph M and see if you want to change that answer. (Conference between counsel and client, not within hearing)

A Yeah, I--my right to appeal.

(Tr. 23-24.)

   The complete transcript of his plea hearing, however, shows that he understood the proceedings. At the start of the hearing, the court asked Morales whether he can "speak, read, write and understand English," and he answered, "I get by." He also confirmed that he fully discussed his indictment and guilty plea with his counsel. When the court asked him if he wanted to review the plea agreement with his attorney once more before the court proceeded with further questions, he declined the opportunity. After Morales consulted with his attorney, the court carefully reviewed the waiver with him again to confirm that he understood that provision:

   Q Okay. If you're sentenced within the appropriate guideline range, as I understand this agreement, you are expressly giving up your right to appeal your sentence and you're also giving up your right to contest your sentence under any post-conviction proceeding, is that true?

   A Yes, sir.

   Q Okay. Do you understand what all that means?

   A Yes.

(Tr. 24.) The court continued:

   Q Do you fully understand the terms of this plea agreement that we went over?

   A Yes, sir.

   Q No doubt about it?

   A No doubt about it, sir.

(Tr. 25-26.) Again, the court confirmed that Morales understood that he was waiving his right to appeal:

   Q Now, normally, under certain circumstances, you or the Government would have the right to appeal any sentence that I impose. But you do understand, sir, that by entering into your plea agreement with the Government and entering your plea of guilty here today, you are giving up your right to appeal your sentence?

   A Yes, sir.

   Q We've gone over that before. Just want to make sure you understand that?

   A Yes, I understand.

(Tr. 30.) And the following exchange occurred at the conclusion of the court's thorough colloquy:

Q Do you have any questions of me about anything you and I talked about here this morning?

A No, sir.

Q You understand everything?

A I understand.

Q Fully and completely?

A No doubt about it.

Q No doubt about it?

A No doubt about it.

(Tr. 44-45.)

Morales's clear and responsive answers throughout the colloquy demonstrate that he comprehended the proceedings, communicated effectively with his counsel, and knowingly and voluntarily waived his right to appeal his sentence. Thus, the district judge did not abuse his "wide discretion" by failing to appoint an interpreter to assist Morales at his plea hearing.

At the subsequent trial, however, the government ensured that Morales testified through an interpreter after he stated that it was difficult for him to speak English, which he could understand only "a little bit." But when he later testified for the government at Santos's sentencing hearing, he did so without an interpreter; and according to Morales, that caused him to become confused, and to inadvertently testify inconsistently with his prior statements and thus squander his downward departure.

At his plea hearing and at the trial, Morales testified that he began collecting bets for Santos in his bolita in 1984. But at Santos's sentencing hearing, Morales testified that it was Roberto Febus (not Santos) who hired him to work in the bolita in 1984, and that Santos did not get involved until late 1987 or early 1988. Moreover, when Morales testified in English at Santos's sentencing hearing, he affirmed that he was positive that Santos started with the bolita in late 1987 or early 1988, because he recalled that it was after the date of his daughter's wedding on March 28, 1987. The government concluded that Morales's testimony was inconsistent, untruthful,/5 and material to the

issue of Santos's sentencing, and thus moved to withdraw its sec.5K1.1 recommendation, which the district court granted.

The record demonstrates that Morales's testimony at Santos's sentencing hearing was deliberate, and not the result of confusion or mistake. His testimony that Santos was involved in the bolita in 1984 was consistent at his plea hearing (without the aid of an interpreter) and at the trial (with an interpreter). At Santos's sentencing hearing, the fact that Morales's testimony linked Santos's involvement with the bolita to sometime after his daughter's wedding day in 1987 (a special and memorable occasion for Morales) shows that his testimony was intentional, and not the result of a misunderstanding. And finally, when Morales claimed that he had difficulty speaking and understanding English at his own sentencing hearing (which occurred after Santos's sentencing hearing), the district judge (who also presided at Morales's plea hearing, at the trial, and at Santos's sentencing hearing) responded that he and Morales "have understood each other from the get-go. Every time I see him, he speaks English and he understands me. I have had no indication in the past that was not the case." While we acknowledge that the conflicting evidence on this issue makes it difficult to resolve, we conclude that Morales had a sufficient command of English to comprehend his proceedings and to testify effectively, and thus was not entitled to an interpreter under the Court Interpreter's Act./6

2.   Sixth Amendment right to counsel.

Morales next argues that his attorney's failure to appear and represent him at Santos's sentencing hearing violated his Sixth Amendment right to counsel. The Sixth Amendment guarantees the defendant the right to counsel at every critical stage of "the proceedings against him," Coleman v. Alabama, 399 U.S. 1, 7 (1970) (quoting Powell v. Alabama, 287 U.S. 45, 69 (1932)), including, for example, the indictment, arraignment, preliminary hearing, and sentencing. United States v. O'Leary, 856 F.2d 1011, 1014 (7th Cir. 1988).

According to Morales, his appearance at Santos's sentencing hearing was a critical stage in his proceedings because the government required his testimony under the plea agreement, and thus his downward departure was still at risk. But Morales was merely a witness at Santos's sentencing hearing, which was not an adversarial process "against him." And while he faced losing his

downward departure if he testified falsely, that does not entitle him to his counsel's assistance, for the Sixth Amendment "is inapplicable to other types of proceedings, even though they may have a critical impact on the destiny of the individual." Ganz v. Bensinger, 480 F.2d 88, 89 (7th Cir. 1973) ("[The Sixth Amendment] does not broadly encompass every proceeding which may result in a deprivation of liberty or property."). Id.

3. Sixth Amendment right to the effective assistance of counsel.

For the first time on appeal, Morales raises several reasons why he was denied his Sixth Amendment right to the effective assistance of counsel. While "it is not our province as an appellate court to make findings regarding counsel's performance when, unlike the district court, we have not had the benefit of actually having observed it," we will resolve this issue "when, as here, both parties ask us to resolve the matter, the question has been briefed and argued, and we have the entire trial record before us." United States v. Reiswitz, 941 F.2d 488, 495 (7th Cir. 1991)./7 "In reviewing a claim of ineffective assistance, we apply the familiar two-pronged test of Strickland v. Washington, 466 U.S. 668 (1984): First, the defendant must prove that his counsel's performance 'fell below an objective standard of reasonableness,' and second that but for counsel's deficiency, there is a reasonable probability that the outcome would have been different." United States v. Alex Janows & Co., 2 F.3d 716, 721 (7th Cir. 1993) (internal citations omitted).

Morales first contends that his counsel was ineffective by failing to refresh his recollection of his prior testimony before Santos's sentencing hearing, and thus he mistakenly testified to the wrong date of Santos's involvement in the bolita, and squandered his downward departure. But since Morales had already testified consistently at his plea hearing and at the trial that he began working as a collector for Santos in the bolita in 1984, his counsel had no reason to believe that he would need to refresh his recollection. Additionally, the record does not indicate that Morales informed his counsel that he needed to review his prior testimony, or that he intended to change his testimony. See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). Rather, the record demonstrates that Morales's

contradictory testimony at Santos's sentencing hearing was deliberate, and not the result of confusion or mistake. And since the Sixth Amendment does not require defense counsel to take all possible precautions to protect a defendant from testifying falsely and breaching his plea agreement, this claim fails./8

Morales next argues that his counsel was ineffective by failing to file a motion to withdraw his guilty plea after the government withdrew its sec.5K1.1 motion. A defendant needs a "fair and just" reason to withdraw a guilty plea. Schilling, 142 F.3d at 398. The plea agreement in this case conditioned the government's obligation to file the sec.5K1.1 motion on Morales's "complete, truthful, and candid testimony." Since Morales's testimony was contradictory, untruthful, and material to the issue of Santos's sentencing, he failed to fulfill his part of the bargain, which allowed the government to withdraw its sec.5K1.1 recommendation. Ramunno, 133 F.3d at 484. With no "fair and just" reason to withdraw his guilty plea, Morales's counsel reasonably decided not to file the motion./9

D.   Roberto Febus

Roberto Febus's pro se appeal raises several challenges to his conviction and sentence. He first contends that a juror's post-verdict statements prove that he was denied his Sixth Amendment right to an impartial jury. He bases his argument on a purported newspaper article that reports statements by a juror that the court's instructions confused her, and that other jurors pressured her to vote for a guilty verdict that she did not truly support. But Febus did not make the article part of the record, so we cannot consider it. See New Haven Inclusion Cases, 399 U.S. 392, 450 n. 66 (1970) (the court will not consider newspaper articles that are not record evidence). Moreover, even if we had the article, it would be inadmissible under Federal Rule of Evidence 606(b), which bars juror comments about any internal influences on the jury's deliberations. Fed. R. Evid. 606(b); see Tanner v. United States, 483 U.S. 107, 121 (1987) (Rule 606(b) "is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences."). Since the juror's statements in this case only involved internal deliberations, and alleged no extraneous influences, this claim fails. United States v. Muthana, 60 F.3d 1217, 1223 (7th Cir. 1995).

Febus next argues that the district court erred when it increased his offense level by four

points under sec. 3B1.1(a) of the Sentencing Guidelines for being an "organizer or leader" of the bolita. According to Febus, although he served as the bolita's interim leader during the late 1970's and early 1980's, he stopped running it years before the offense of conviction (1989 to 1994), and thus his leadership activities were not relevant conduct. The district court found, however, that since the bolita was in continuous operation from the 1960's to the 1990's, Febus's leadership stint was relevant conduct to his offense of conviction, and thus qualified him for the sentencing enhancement.

"We review a district court's application of the sentencing guidelines de novo but defer to the court's finding of facts unless they are clearly erroneous." United States v. Payton, 198 F.3d 980, 982 (7th Cir. 1999). Under sec. 3B1.1(a), the district court may increase a defendant's offense level by four points if the defendant "was an organizer or leader" of a criminal enterprise that involved five or more participants. U.S.S.G. sec. 3B1.1(a). Furthermore, "the sentencing court need not confine itself to the offense of conviction but may look to all relevant conduct within the scope of U.S.S.G. sec. 1B1.3 (Relevant Conduct)." United States v. Montague, 29 F.3d 317, 323 (7th Cir. 1994). Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." United States v. Griffin, 194 F.3d 808, 826-27 (7th Cir. 1999); U.S.S.G. sec. 1B1.3(a)(2).

In this case, the record demonstrates that: 1) the bolita ran continuously from the 1960's until 1994; 2) Febus ran the Indiana operation in the late 1970's and early 1980's; and 3) he also allowed the bolita's runners to use his bar in the 1990's as a collection site for betting slips and money. Precisely because Febus's interim leadership of the bolita was part of the illegal lottery's continuous operation, his leadership conduct was relevant to his offense of conviction. Furthermore, because he was still participating in the same bolita over a decade later, he never abandoned the conspiracy. See United States v. Patel, 879 F.2d 292, 294 (7th Cir. 1989) (unless a conspirator affirmatively abandons the conspiracy, he cannot limit his responsibility for its consequences). Therefore, the district court did not err in finding that Febus's interim leadership of the bolita was "relevant conduct" to his offense of conviction, and thus qualified him for the sentence enhancement.

Febus also asserts that the government violated

18 U.S.C. sec. 201(c)(2) by providing leniency and money to government witnesses. This argument was originally sanctioned, then rejected by the Tenth Circuit. United States v. Singleton, 165 F.3d 1297 (10th Cir.) (en banc), cert. denied, 527 U.S. 1024 (1999). The government's grant of leniency is not "a thing of value" under the statute. United States v. Condon, 170 F.3d 687, 689 (7th Cir.), cert. denied, 119 S.Ct. 1784 (1999). And since "Section 201(c)(2) is a criminal statute, not a private right of action or a rule of evidence," it does not exclude evidence or provide a basis for individual remedies. Id. The record shows that the purpose of the government's cash payments to two witnesses was to cover their expenses, not to purchase their testimony. And even in cases where the government pays informants for their testimony, we have held that such arrangements "are not per se outrageous; rather the jury may consider [them] as evidence relating to the informant's credibility." United States v. Miller, 891 F.2d 1265, 1268 (7th Cir. 1989). Here, since the jury knew about the government's payments to the witnesses, we have no reason to disturb their verdict under sec. 201(c)(2).

Febus raises Sixth Amendment ineffective assistance of counsel claims as well; since the parties have briefed this issue, and we have the record before us, we will resolve it. Reiswitz, 941 F.2d at 495. But arguing and resolving the issue here precludes any subsequent challenge under 28 U.S.C. sec. 2255./10

Febus contends that his counsel should have asked Ken Eto (a government witness who narrowly survived an assassination attempt in which he sustained gunshot wounds to his head) about his head wounds and whether he was fit to testify. Eto was associated with organized crime in Chicago where he ran the bolita's Illinois operation until he became an informant for the FBI in 1983 after the assassination attempt. Febus's counsel cross-examined Eto, but declined to ask him about his gunshot wounds and risk opening the door for the government to inform the jury about his participation in organized crime. That was a reasonable strategy. See Kokoraleis v. Gilmore, 131 F.3d 692, 696 (7th Cir. 1997)./11

E.  Jose Santos

Jose Santos's appellate counsel seeks to withdraw under Anders v. California, 386 U.S. 738 (1967), because he believes that there are no nonfrivolous issues for appeal. Pursuant to Circuit Rule 51(b), Santos filed a response to counsel's motion. Because counsel's Anders brief is adequate on its face, we consider only those issues raised in the brief and Santos's response.

See United States v. Tabb, 125 F.3d 583, 584 (7th Cir. 1997) (per curiam). And our "duty is merely to determine whether counsel is correct in believing those grounds frivolous." United States v. Wagner, 103 F.3d 551, 553 (7th Cir. 1996).

Counsel first considers whether Santos could argue that there was insufficient evidence to support Santos's convictions for conspiracy, in violation of 18 U.S.C. sec. 371, and for aiding and abetting the bolita's operation, in violation of 18 U.S.C. sec. 1955 and sec. 2. Santos "bears an extremely heavy burden" on this issue, as we will reverse a conviction only if "we determine that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." Vega, 72 F.3d at 513. To establish a violation of sec. 1955, the government must prove that Santos "conducted" the bolita. United States v. Cyprian, 23 F.3d 1189, 1199 n. 14 (7th Cir. 1994) (citing 18 U.S.C. sec. 1955). To "conduct" means "to perform any act, function or duty which is necessary to or helpful in the ordinary operation of the business, and . . . a person may be found to conduct a gambling business even though he is a mere servant or employee having no part in the management or control of the business and no share in the profits." Id. at 1199 n. 15 (quoting United States v. Greco, 619 F.2d 635, 638 (7th Cir. 1980)).

Jose Santos rented a bar called the "Poolroom," and allowed the bolita's operators (including his brother Efrain Santos) to use the Poolroom as a bolita collection site after another bar/collection site was searched by authorities. Therefore, the record demonstrates that Santos knew that he was facilitating the bolita's continued operation by allowing his bar to function as a new collection site, and thus counsel properly concluded that this argument would be frivolous.

Counsel also considered whether Santos could argue that the district court should have severed Jose Santos from Efrain Santos under Fed. R. Civ. P. 14, or admonished the witnesses early in the trial to specify when they were speaking about Jose or Efrain Santos. Because Jose Santos's trial counsel did not seek a severance, this issue is reviewed for plain error only. United States v. Wilson, 134 F.3d 855, 862-63 (7th Cir. 1998). According to the Supreme Court:

We believe that, when defendants have been properly joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific right of one of the defendants, or prevent the jury from making a

reliable judgment about guilt or innocence.

Zafiro v. United States, 506 U.S. 534, 539 (1993).

Santos cites to no cases in which co-defendants with the same last name required a severance, and he does not specify any instances in the record where he may have been prejudiced. We will not scour the record "searching haystacks for needles," Wagner, 103 F.3d at 553, to discover specific testimony that supports Santos's argument, and we agree with counsel's conclusion that this argument is frivolous.

Finally, counsel considered whether Santos could argue that the district court erred by refusing to adjust Santos's sentence downward by two points for being a minor participant in the bolita under Guideline sec. 3B1.2(b). We lack jurisdiction to review a district court's discretionary refusal to depart downward unless the sentence was imposed in violation of the law or as a result of an incorrect application of the sentencing guidelines. United States v. Yoon, 128 F.3d 515, 529 (7th Cir. 1997). In this case, the district court's statements at the sentencing hearing indicate that it knew it had authority to depart, but decided, in its discretion, that Santos "in no way" qualified for a downward departure. Moreover, the record demonstrates that Santos participated in the bolita in a substantial way by knowingly providing his bar as a collection center for the bolita's operations in exchange for a monthly payment. We conclude, therefore, that this argument is frivolous. Accordingly, we grant counsel's motion to withdraw and dismiss Jose Santos's appeal.

In conclusion, we AFFIRM the district court's decisions by holding that: 1) there was sufficient evidence to convict Efrain Santos of money laundering, and thus his sentence was proper; 2) the district court did not abuse its discretion in denying Benedicto Diaz's motion to withdraw his plea agreement; 3) Angel Morales was not entitled to an interpreter under the Court Interpreter's Act, and was not denied his Sixth Amendment right to counsel or his right to the effective assistance of counsel; and 4) Roberto Febus was not denied his Sixth Amendment right to an impartial jury or his right to the effective assistance of counsel, and that his conviction and sentence were proper. We also GRANT Jose Santos's appellate counsel's motion to withdraw, and we DISMISS Jose Santos's appeal.


/* Appeals No. 98-1252 and 98-2709 were submitted for decision without oral argument.

/1 Jose Santos (Efrain Santos's brother) participated in the bolita by allowing the bolita's operators to use his bar (the "Poolroom") as a new collection center for money and betting slips after another collection site was searched by authorities. The grand jury returned a ten-count indictment against Jose Santos, and he was convicted of Count 1 (conspiracy to conduct an illegal gambling business, in violation of 18 U.S.C. sec. 371), and Count 2 (aiding and abetting the conducting of an illegal gambling business, in violation of 18 U.S.C. sec. 1955 and sec. 2). Jose Santos was sentenced to 12 months on each count to serve concurrently.

Jose Santos's appellate counsel filed an Anders brief. For the sake of clarity (and because Efrain Santos was the leader of the bolita, and his trial and conviction took center stage in this case) we will address Jose Santos's Anders brief in Part E of this opinion only. All other references to "Santos" in this opinion (other than in Part E) refer to Efrain Santos.

/2 Santos also challenges his sentence, contending that since his money laundering conviction cannot stand, his base offense should be gambling and not money laundering. Because we have determined that Santos's conviction for money laundering was correct, there was no sentencing error.

/3 The government files a sec.5K1.1 motion when "the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. sec.5K1.1.

/4 At oral argument, Diaz contended that since this examination took place after the government's lengthy direct testimony, and cross-examination by four defense lawyers, he became confused and actually asserted that he never thought that it was illegal to write "printer" on his tax form, not that he lacked knowledge of the bolita's illegality. In his brief, however, Diaz admits that he testified that he did not know that the bolita was illegal in 1993, and it is clear from the complete transcript of his testimony, as well as his later testimony at his sentencing hearing, that in fact Diaz asserted at trial that he never knew that the bolita was illegal.

/5 The record shows that Santos ran the bolita in 1984, and Morales does not dispute that fact on appeal.

/6 For the same reasons, we reject Morales's claim that the district court erred in granting the

government's motion to withdraw its sec.5K1.1 recommendation; because the claim is based on his allegation that since his language barrier caused the discrepancy in his testimony, he did not breach his plea agreement by intentionally giving false testimony.

/7 We acknowledge that Morales is not precluded as a matter of law from raising his Sixth Amendment challenge on direct appeal rather than upon collateral attack. United States v. Madewell, 917 F.2d 301, 303-04 n.1 (7th Cir. 1990). But we note that to raise this claim on direct appeal "is often a disservice to the defendant because resolution of this issue on appeal may preclude the defendant from later developing a record and presenting the issue in a proceeding pursuant to 28 U.S.C. sec. 2255." United States v. Lawson, 947 F.2d 849, 853 n.1 (7th Cir. 1991). We consider these issues now because they have been fully briefed and argued and neither defendant, through the time of oral argument, has requested that the issue be withdrawn.

/8 Morales also suggests that his counsel could have protected him from his inconsistent testimony (and thus preserved his sec.5K1.1 departure) by quashing the government's subpoena, or by appearing at Santos's sentencing hearing to assert his Fifth Amendment privilege against self-incrimination. But if Morales's counsel pursued either strategy, Morales would have forfeited his downward departure anyway, because the government's obligation to recommend the sec.5K1.1 motion was contingent upon Morales's continued cooperation, and his "complete, truthful and candid information and testimony."

Morales also asserts that his counsel was ineffective by failing to provide him with an interpreter at Santos's sentencing hearing. But this claim fails because we have already determined that the discrepancy in Morales's testimony was not the result of any alleged language barrier.

/9 And, contrary to Morales's position, the district court could not grant him a downward departure under sec.5K1.1 without the government's motion, which remains an "essential prerequisite" for the court's power to depart. United States v. Santoyo, 146 F.3d 519, 523 (7th Cir. 1998).

/10 Supra, note 7.

/11 Febus's additional Sixth Amendment claims are patently frivolous. First, he alleges that his counsel was ineffective because he failed to investigate whether the government violated sec. 201(c)(2) when it granted plea agreements to Morales, Diaz, and another co-defendant named

McElroy in exchange for their testimony. But we have already established that plea agreements are not "a thing of value" under the statute, and this claim fails. Condon, 170 F.3d at 689. He also claims that his attorney was ineffective by failing to present evidence (in the form of certain affidavits that are not part of the record) to show that he did not participate in the bolita after 1981, and thus the court erred by enhancing his sentence under sec. 3B1.1. But we will not consider the affidavits (which also contradict the facts in the record that bolita runners used his bar in the early 1990's), DeTomaso v. McGinnis, 970 F.2d 211, 214 (7th Cir. 1992); and we conclude that there was no deficient performance. Febus also throws in a conclusory statement that his counsel failed to investigate the facts relating to the court's enhancement of his sentence for obstruction of justice. But because there is no evidence in the record to support this argument, it fails as well.

  Febus's remaining argument--that the government erroneously charged him with conspiracy under 18 U.S.C. sec. 371 because the statute only applies to conspiracies against the government-- fails because sec. 371 also prohibits conspiracies that violate the laws of the United States, including the illegal gambling statute, 18 U.S.C. sec. 1955. See United States v. Brandon, 17 F.3d 409, 422 (1st Cir. 1994).